877 A.2d 383

**PENNSYLVANIANS AGAINST GAMBLING EXPANSION FUND, INC. et al., Petitioners,**

**v.**

**COMMONWEALTH of Pennsylvania, et al., Respondents.**

**No. 229 MM 2004.**

Supreme Court of Pennsylvania.

Argued March 9, 2005.

Decided June 22, 2005.

276

278

280

282

284

Alan J. Davis, Esq., Philadelphia, for amicus curiae Pennsylvania Division, Horsemen's Benevolent and Protective Association, Inc., et al.

Dennis Edward Boyle, Esq., for amicus curiae The Family Research Council, et al.

Robert A. Graci, Esq., Alan C. Kohler, Esq., Alan C. Kohler, Esq., Wormleysburg, for Greenwood Racing, Inc. and Magna Entertainment Corp.

James J. West, Esq., Randall Luke Wenger, Esq., Robert Richard Long, Jr., Esq., Leonard Gilbert Brown, III, Esq., Harrisburg, for Pennsylvanians Against Gambling Expansion Fund, et al.

Gerald J. Pappert, Esq., Thomas W. Corbett, Calvin R. Koons, Esq., Amanda L. Smith, Esq., John G. French, Esq., Harrisburg, for Commonwealth of Pennsylvania.

Linda J. Shorey, Esq., for Senate of Pennsylvania.

Gregory Eugene Dunlap, Esq., Peter Grattan Glenn, Esq., Harrisburg, for Commonwealth of Pennsylvania, Edward G. Rendell, Governor.

Arlene Fickler, Esq., Lawrence T. Hoyle, Jr., Esq., Philadelphia, for Pennsylvania Gaming Control Board.

Thomas Walter Dymek, Esq., C. Clark Hodgson, Jr., Esq., Philadelphia, for House of Representatives of Pennsylvania.

James Francis Tierney, IV, Esq., Pittsburgh, for Minority Leader of the Pennsylvania Senate.

Jonathan F. Bloom, Esq., Philadelphia, for Minority Leader of the Pennsylvania House of Representatives.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Chief Justice CAPPY.

In this matter, we are asked to resolve, *inter alia,* numerous facial constitutional challenges to the regularity of the procedures employed by the General Assembly in enacting Act 2004–71, The Pennsylvania Race Horse Development and Gaming Act (the "Gaming Act" or the "Act"). 4 Pa.C.S. § 1101 *et seq.* These challenges were brought via a Petition in the Nature of a Complaint Seeking Declaratory Judgment and Injunctive Relief (the "Complaint") filed by five members of the General Assembly, seven organizations, a Lancaster County Commissioner, and five named individuals (collectively,

"Petitioners")[1] against the Commonwealth of Pennsylvania, certain Commonwealth officials, and the Pennsylvania Gaming Control Board (collectively, "Respondents").[2] Certain Respondents filed preliminary objections in the nature of a demurrer to the Complaint contending, *inter alia,* that the General Assembly did not violate our Constitution in the passage of the Gaming Act. For the reasons that follow, we sustain the Gaming Act, with the exception of certain collateral provisions which can be stricken in light of the Gaming Act's severability provision.[3]

1. Petitioners are: Pennsylvanians Against Gambling Expansion Fund, Inc.; Pennsylvania Family Institute; The League of Women Voters of Pennsylvania; Gibson E. Armstrong, Senator of the 13th Senatorial District; Paul I. Clymer, Representative of the 145th Legislative District; Gregory S. Vitali, Representative of the 166th Legislative District; Gibson C. Armstrong, Representative of the 100th Legislative District; Jerry A. Stern, Representative of the 80th Legislative District; Dick Shellenberger, Lancaster County Commissioner; The Commonwealth Foundation; The Keystone Christian Education Association; A United Methodist Witness of Pennsylvania; No Dice, Inc.; The Reverend Dr. Thomas E. Richards, Jr., in his individual capacity; Mark Kovscek, in his individual capacity; Christ G. Lapp, in his individual capacity; Lois J. Romberger, in her individual capacity; and C. Douglas Rothgaber, in his individual capacity.

2. Respondents are: Commonwealth of Pennsylvania; Edward G. Rendell, in his official capacity as Governor of the Commonwealth of Pennsylvania; Robert C. Jubelirer, President *Pro Tempore* of the Senate of the Commonwealth of Pennsylvania; John M. Perzel, Speaker of the House of Representatives of the Commonwealth of Pennsylvania; Robert J. Mellow, Minority Leader of the Senate of the Commonwealth of Pennsylvania; H. William DeWeese, Minority Leader of the House of Representatives of the Commonwealth of Pennsylvania; and The Pennsylvania Gaming Control Board.

3. The Gaming Act's severability provision, 4 Pa.C.S. § 1902 "Severability" states that the provisions of this legislation are severable except with two limited exceptions regarding the Pennsylvania Gaming Control Board and the Slot Machine License fee:

(a) General rule.—Except as provided in subsection (b), the provisions of this part are severable. If any provision of this part or its application to any person or circumstances is held invalid, the invalidity shall not affect other provisions or applications of this part which can be given effect without the invalid provision or application.
(b) Limitation.—If any of the provisions of section 1201 (relating to Pennsylvania Gaming Control Board established) or 1209 (relating to slot machine license fee) or their application to any person or

At the outset, it is important to make clear that we are neither passing on the wisdom of the substantive provisions of this Act nor on whether gaming in general is in the best interests of the citizens of our Commonwealth. These decisions are for the General Assembly. We are only considering the discrete legal issues that have been raised for our review primarily regarding the constitutionality of the procedure by which the General Assembly passed this piece of legislation.

█ Within this realm, we proceed to consider the facts, certain threshold issues, the arguments of the parties, and finally the resolution of the constitutional issues before us. Although the standard for entertaining preliminary objections in the nature of a demurrer would ordinarily constitute the sole criterion for review, here the parties have agreed, pursuant to Section 1904, 4 Pa.C.S. § 1904, to proceed to final merits resolution without creating a factual record. Therefore, relief will be granted to Petitioners only where it is warranted solely from the face of the title and content of the bill as enrolled, together with the judicially noticeable legislative history. See *City of Philadelphia et al. v. Commonwealth of Pennsylvania*, 575 Pa. 542, 838 A.2d 566, 580 (2003). In all other instances, relief will be denied.

The Complaint, as well as the brief of Petitioners, sets forth the material facts regarding House Bill 2330 of 2004 ("HB 2330") and the process by which that bill became the Gaming Act. Specifically, HB 2330 was introduced on February 3, 2004. It was titled "An Act Providing for the Duties of the Pennsylvania State Police Regarding Criminal History Background Reports for Persons Participating in Harness or Horse Racing." At this point in time, the bill dealt exclusively with the Pennsylvania State Police providing support to the State Harness and Horse Racing Commissions by performing criminal history checks and the verification of fingerprints of applicants for licensure under the Race Horse Industry Re-

circumstance are held to be invalid by any court, the remaining provisions of this part and its application shall be void.
4 Pa.C.S. § 1902; *see also* 1 Pa.C.S. § 1925 (offering that provisions of every statute shall be severable).

form Act of 1981. It was one page in length. (H.B. 2330 Printer's No. 3251).

Thereafter, the bill went through three considerations in the House and two considerations in the Senate.[4] In the last consideration in the Senate on Thursday, July 1, 2004, the content of the bill was amended. Additionally, the bill's title was changed to express the multiple amendments made to the bill. These amendments were extensive, increasing the length of the bill from one page to 145 pages which included seven chapters and 86 sections. The bill as amended included the creation of the Pennsylvania Gaming Control Board ("Gaming Control Board" or "Board"), the issuance of gambling licenses

4. Specifically, on March 16, 2004, HB 2330 received its first consideration in the House. The next day, HB 2330 was given second consideration and recommitted to the Appropriations Committee. On March 22, 2004, HB 2330 was re-reported from the Appropriations Committee and was given third consideration and final passage by the House. That same day, HB 2330 was referred to the Law and Justice Committee in the Senate. The next day, the bill was reported out of the Committee on Law and Justice and was given its first consideration in the Senate. On March 29, 2004, HB 2330 received its second consideration by the Senate. Over one month later, on May 10, 2004, however, the bill was passed over without objection and recommitted to the Committee on Law and Justice pursuant to Senate Rule 10 regarding the order of business. Eight days later, HB 2330 was reported out of the Law and Justice Committee to the Senate. Again, over one month later, on June 28, 2004, the bill was recommitted to the Committee on Law and Justice and was passed over without objection pursuant to Senate Rule 10 dealing with order of business. The next day, on June 29, 2004, HB 2330 was again reported out of the Law and Justice Committee in the Senate.

On July 1, 2004, the bill was presented to the Senate for a third and final consideration. In the Senate, Senator Tomlinson offered Amendment No. A3055 which amended HB 2330. HB 2330 was given a new printer number, Printer's No. 4272 (SLJ No. 45). After a number of unsuccessful attempts to amend the bill further, the bill was passed back to the House for acceptance or rejection. The bill was passed at approximately 2:00 a.m. on Friday July 2, 2004 (which was still considered the July 1, 2004 legislative session for purpose of computing legislative days). On July 2, 2004, HB 2330 was sent to the House with a Senate message and was referred to the House Rules Committee. On Saturday July 3, 2004, HB 2330 was reported out of the House Rules Committee, submitted to a vote in the House on a committed basis, was passed, and was signed in the House. On Sunday July 4, 2004, the bill was signed in the Senate. Governor Edward Rendell signed the bill into law on Monday, July 5, 2004, as Act 71 of 2004.

authorizing the creation of a variety of slot machine casinos, the generation and distribution of revenues from the licenses, the creation of numerous funds including the Gaming Fund, the Pennsylvania Horse Race Fund, the Gambling and Economic Development and Tourism Fund, the Property Tax Relief Fund as well as a Compulsive and Problem Gambling Treatment Fund. Additionally, the amended bill contained a chapter regarding administration and enforcement and provided for exclusive jurisdiction in our Court regarding disputes over the issuance of licenses and challenges to the Gaming Act.

On Saturday, July 3, 2004, the bill as amended was submitted to the House for a vote on a committed basis; the amended bill was passed and was signed in the House. The next day, on Sunday, July 4, 2004, the bill was signed in the Senate. On Monday, July 5, 2004, Governor Edward Rendell signed the bill into law as Act 71 of 2004.

Approximately five months later, on December 10, 2004, Petitioners filed their Complaint in which they alleged that the Gaming Act is unconstitutional since it was passed in violation of Article III, Sections 1, 3, 4, 6, and 10 of the Pennsylvania Constitution and is an unconstitutional delegation of power to the Gaming Control Board. Certain Respondents filed preliminary objections in the nature of a demurrer contending that the enactment of the Gaming Act did not violate our Constitution. The Gaming Control Board filed an answer to the Complaint, as well as an application for summary relief pursuant to Pennsylvania Rule of Appellate Procedure 1532(b), in essence, raising the same issues as were raised by the other Respondents in their preliminary objections.

Petitioners moved to expedite resolution of this matter, and Respondents agreed with Petitioners' request for an expedited procedure. Our Court, on February 11, 2005, directed our Prothonotary to order an expedited briefing schedule, and oral arguments were held on Wednesday, March 9, 2005 in Pittsburgh, Pennsylvania.

Prior to considering the merits of the legal issues before us, we must address two threshold matters. First, we will determine our jurisdiction to entertain this challenge and second, the standing of certain parties.

With respect to jurisdiction, we do not stand in our customary posture as an appellate court. Rather, in this matter, the General Assembly, through the Gaming Act, has vested our Court with original and exclusive jurisdiction to resolve any challenge to the constitutionality of the Gaming Act. Specifically, Section 1904 of the Gaming Act states:

The Pennsylvania Supreme Court shall have exclusive jurisdiction to hear any challenge to or to render a declaratory judgment concerning the constitutionality of this part. The Supreme Court is authorized to take such action as it deems appropriate, consistent with the Supreme Court retaining jurisdiction over such a matter, to find facts or to expedite a final judgment in connection with such a challenge or request for declaratory relief.

4 Pa.C.S. § 1904.

■ Although we stand in a unique posture, all parties agree that jurisdiction by our Court over Petitioners' Complaint is proper.[5] Based upon Section 1904 of the Gaming Act, we conclude that we have jurisdiction over this matter to resolve Petitioners' challenges and request for declaratory judgment.

A second threshold matter involves standing. Specifically, Respondents question the standing of the non-legislative Peti-

---

**5.** In his preliminary objections, Senator Jubelirer maintains that our Court does not have jurisdiction over a single count, Count VI of the Complaint (relating to non-delegation of authority) as that provision, even if found to be unconstitutional, is severable. We reject this assertion as the statute conferring jurisdiction on our Court is not limited to only constitutional challenges that would result in the striking of the Gaming Act *in toto*. Rather, Section 1904 offers that our Court "shall have exclusive jurisdiction to hear *any challenge* to or to render a declaratory judgment concerning the constitutionality of this part." 4 Pa.C.S. § 1904 (emphasis supplied). As the non-delegation count constitutes a challenge concerning the constitutionality of the Gaming Act, we conclude that we have jurisdiction over this count in addition to other challenges.

tioners, arguing that they do not have standing to challenge the Gaming Act. *See generally William Penn Parking Garage v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975). Respondents acknowledge, however, that the legislative Petitioners do have standing to bring the current constitutional challenge. Accordingly, we find it unnecessary to resolve Respondents' standing challenge to the non-legislative Petitioners as the Petitioners that Respondents concede have standing, together with the contested Petitioners, collectively assert the various legal challenges to the Gaming Act. *See City of Philadelphia*, 838 A.2d at 579 n. 8 (finding that as one party has standing, the Court need not consider whether another party also has standing).[6]

 Having resolved the threshold issues, we now turn to the legal issues before us. Since the Complaint is based on challenges to the constitutionality of the statute, we must begin by considering the standard by which we resolve constitutional challenges to legislative actions. First, our case law makes clear that there is a strong presumption in the law that legislative enactments do not violate our Constitution. *See Pennsylvania School Boards Ass'n., Inc. et al. v. Commonwealth Ass'n. of School Administrators*, 569 Pa. 436, 805 A.2d 476, 479 (2002). This includes the manner by which legislation is enacted. *Id.* Accordingly, a statute will not be declared unconstitutional unless it *clearly, palpably,* and *plainly* violates the Constitution. *Id.* (emphasis supplied). All doubts are to be resolved in favor of finding that the legislative enactment passes constitutional muster. *Commonwealth v. Hendrickson*, 555 Pa. 277, 724 A.2d 315, 317 (1999). Thus, there is a very heavy burden of persuasion upon one who challenges the constitutionality of a statute. *Commonwealth v. Barud*, 545 Pa. 297, 681 A.2d 162, 165 (1996). It is with this

6. Respondents also assert, with little advocacy, that based upon the Political Question Doctrine and the Enrolled Bill Doctrine, our Court should not inquire into the manner in which the Gaming Act was passed. We reject these arguments for the oft-stated reasons set forth in our prior decisions. *See, e.g., Consumer Party v. Commonwealth,* 510 Pa. 158, 507 A.2d 323, 335 (1986); *see also City of Philadelphia,* 838 A.2d at 579–80.

burden and the extremely deferential standard by which we view constitutional challenges in mind that we turn to the arguments of the parties.

### Section I

Petitioners' first set of challenges to the Gaming Act involves Article III of our Constitution relating to legislation. Article III can be viewed as a constellation of constitutional requirements that govern various aspects of the legislative enactment procedure. Each of these provisions was born in a time in which Pennsylvanians were experiencing rapid growth economically and " 'wrenching' social change...." K. GORM-LEY, THE PENNSYLVANIA CONSTITUTION, § 3.6[a], p. 61 (2003). An enormous growth in the corporate form of business organization led to significant concentrations of wealth and the corruption of numerous legislators. *Id.* at 62. Corruption took the form of special laws legislation, logrolling,[7] and arbitrary favoritism and was met with a demand for reform. *Id.* The Constitutional Convention of 1872–73 was convened to reform corrupt legislative behavior, and to this end, the result was the constitutional strictures contained in Article III. *See* R. BRANNING, PENNSYLVANIA CONSTITUTIONAL DEVELOPMENT 37 (1960). Thus, while these changes to the Constitution originated during a unique time of fear of tyrannical corporate power and legislative corruption, these mandates retain their value even today by placing certain constitutional limitations on the legislative process.

### Section I (A)

Specifically, Article III, § 3 of our Pennsylvania Constitution sets forth dual mandates for the General Assembly which prohibit the passing of a bill that contains more than one subject and requires that the subject be clearly expressed in

---

7. "Logrolling" is the practice of "embracing in one bill several distinct matters, none of which could singly obtain the assent of the legislature, and procuring its passage by combining the minorities who favored the individual matters to form a majority that would adopt them all." Charles W. Rubendall II, *The Constitution and the Consolidated Statutes*, 80 DICK L.REV. 118, 120 (1975).

its title. The focus of Petitioners' primary challenge is Section 3's single subject requirement.

> **No bill shall be passed containing more than one subject,** which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

PA. CONST. art. III, § 3 (emphasis supplied).

Petitioners merge their arguments regarding single subject and clearly expressed title. This is not necessarily surprising, as in *City of Philadelphia*, our Court indicated that these twin requirements are interrelated in that they both proscribe introducing measures into bills without providing reasonable notice of the same. *City of Philadelphia*, 838 A.2d at 586. Although interrelated, and Petitioners address these two aspects of Article III, Section 3 together in their brief, we will parse the arguments and consider the twin directives separately.

With respect to the single subject requirement, Petitioners argue that, in interpreting Article III, Section 3, in *City of Philadelphia*, our Court set forth the relevant standard to be utilized in determining whether the process by which a piece of legislation has been enacted withstands constitutional challenge. In sum, Petitioners maintain that the amendments to a bill must be "germane" to the bill's subject. Whether the subject matter is viewed as the Commonwealth's "Racehorse Industry" or "Pennsylvania Horse Racing Industry Development and Other Gaming," Petitioners assert that the germaneness test is not met and that by changing the bill to encompass more than one subject, the General Assembly violated Article III, Section 3.

Respondents counter that the Gaming Act does not violate Article III, Section 3 because the amendment made to HB 2330 was germane to the general subject of the bill. Respondents offer that amendments to bills are permissible when the amendments are germane to and do not wholly change the general subject of the bill. Indeed, Respondent's state that it is expected that legislation will be transformed during the

enactment process. According to Respondents, courts have traditionally taken a broad view of the overall subject of a bill. Unlike the legislation at issue in *City of Philadelphia*, in which the vast subject of "municipalities" was rejected as overly broad for constitutional purposes, here, all provisions of the Gaming Act relate to the single subject of regulating gaming.

Our analysis of Petitioners' first constitutional challenge begins with our recent decision in *City of Philadelphia*. A scant two years ago, our Court engaged in an in-depth analysis of the aim and application of Article III, Section 3 to certain legislation. Justice Saylor, writing for a unanimous Court, set forth a detailed discussion of the purpose behind Section 3 as well as the evolution of the jurisprudential treatment of this section.

In broad terms, Article III's aim was to "place restraints on the legislative process and encourage an open, deliberative, and accountable government." *City of Philadelphia*, 838 A.2d at 585 (quoting *Pennsylvania AFL–CIO ex rel. George v. Commonwealth*, 563 Pa. 108, 757 A.2d 917, 923 (2000)). More specifically, Section 3 was designed to curb the practice of inserting into a single bill a number of distinct and independent subjects of legislation and purposefully hiding the real purpose of the bill. *City of Philadelphia*, 838 A.2d at 586. Related thereto, the single subject requirement prohibits the attachment of riders that could not become law as is, to popular legislation that would pass. An additional benefit of the Section 3 requirements is that there will be a greater probability that a bill containing a single topic will be more likely to receive a considered review than a multi-subject piece of legislation. *Id.*, citing Millard H. Ruud, *No Law Shall Embrace More Than One Subject*, 42 MINN. L.REV. 389, 391 (1958)(offering that an additional purpose served by the one-subject rule is to facilitate orderly legislative procedure). As we indicated in *City of Philadelphia*, the single subject requirement proscribed the inclusion of provisions into legislation without allowing for "fair notice to the public and to legislators of the existence of the same." *City of Philadel-*

*phia,* 838 A.2d at 587. Thus, reasonable notice is the keystone of Article III, Section 3.

 While recognizing the importance of Section 3, we acknowledged that bills are frequently subject to amendments as they proceed through the legislative process and not every supplementation of new material is violative of the Constitution. Thus, "where the provisions added during the legislative process assist in carrying out a bill's main objective or are otherwise 'germane' to the bill's subject as reflected in its title," the requirements of Article III, Section 3 are met. *Id.* Article III, Section 3 must have, however, some limits on germaneness, for otherwise virtually all legislation—no matter how diverse in substance—would meet the single-subject requirement, rendering the strictures of Section 3 nugatory. As stated by our Court in *Payne v. School Dist. of Coudersport Borough,* 168 Pa. 386, 31 A. 1072, 1074 (1895), "no two subjects are so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough." Thus, defining the constitutionally-valid topic too broadly would render the safeguards of Section 3 inert. Conversely, the requirements of Section 3 must not become a license for the judiciary to "exercise a pedantic tyranny" over the efforts of the Legislature. *City of Philadelphia,* 838 A.2d at 588 (citing *Estate of Rochez,* 511 Pa. 620, 515 A.2d 899, 902 (1986)). Indeed, "[f]ew bills are so elementary in character that they may not be subdivided under several heads. . . ." *Payne,* 31 A. at 1074.

In light of this tension, as well as the purpose of Article III, Section 3, our focus in *City of Philadelphia* fell upon whether there was a single unifying subject to which all of the provisions of the act are germane. *City of Philadelphia,* 838 A.2d at 589. While acknowledging that exercising deference by hypothesizing a reasonably broad topic was appropriate, to some degree, in determining whether the bill passed constitutional muster, *id.* at 588, the vast subject of "municipalities" stretched the concept of a single topic beyond the breaking point. Indeed, it was not apparent how the diverse subject-matter had a logical or legislative nexus to each other. *Id.* at

589. Finding that, as virtually all of local government is a municipality, the proposed subject was simply too broad to qualify for single subject status for purposes of Article III, Section 3.[8] Thus, we struck the statute as constitutionally infirm.

In contrast to *City of Philadelphia,* in the matter *sub judice,* there is a single unifying subject—the regulation of gaming. The single topic of gaming does not encompass the limitless number of subjects which could be encompassed under the heading of "municipalities." Specifically, HB 2330 sets forth the legislative intent of regulating gaming, creates the Gaming Control Board, establishes policies and procedures for gaming licenses for the installation and operation of slot machines, enacts provisions to assist Pennsylvania's horse racing industry through other gaming, and provides for administration and enforcement of the gaming law, including measures to insure the integrity of the operation of slot machines.

### Section I(B)

Yet, one particular aspect Petitioners' argument regarding the single subject requirement warrants further discussion. Petitioners contend that the bill's distribution of monies represents additional "subjects" contained in the bill which are unrelated to the development of what Petitioners consider to the be the alleged single subject—"development of the 'horse race industry.'" Petitioners' Brief at p. 36. Specifically, Petitioners point to the disbursement of funds to a variety of entities therein which they claim is strong evidence of the bill containing unconstitutionally disparate subjects. These recipients include:

the Pennsylvania Convention Center, the Pittsburgh International Airport, Pittsburgh Hotel and Convention Center,

8. Even accepting "municipalities" as the overarching subject of the act, we went on to note that a change in the composition of the Pennsylvania Convention Center Authority's governing board could not readily be deemed to be germane to that topic as the Convention Center was an instrument of the Commonwealth, and not a municipal authority. *Id.* at 589–90.

various indebtedness from urban redevelopment laws, ... transfers of money to the Volunteer Fire Company Grant Program, five million dollars for local law enforcement and each county that receives payments "under ... the Forest Reserves Municipal Financial Relief Law."

*Id.* (record citations and footnote omitted).

Respondents maintain that these disbursements do not run afoul of the single-subject mandate as the fees originate from gaming activities, and thus, the allocation of the fees has a nexus to the single subject of the regulation of gaming. In support thereof, Respondents point to our decision in *Commonwealth ex rel. Bell v. Powell*, 249 Pa. 144, 94 A. 746 (1915), and suggest that our Court has found that the allocation of fees collected "naturally" follows their imposition, and therefore does not violate Article III, Section 3. *See, e.g.*, Respondent Robert C. Jubelirer's Brief at p. 25.

At the outset, we note that our decision in *City of Philadelphia* does not answer the question posed by this specific challenge, since that decision was focused upon the attempt to treat disparate matters of *substantive* legislation in a single legislative enactment. *See City of Philadelphia*, 838 A.2d at 585. The arguments presented here implicate a more specialized aspect of Article III, Section 3 jurisprudence, namely, the Legislature's creation and treatment of special funds generated ancillary to substantive legislation.

With respect thereto, Respondents have identified an undisputed, factual, source relationship, or source nexus, between the overall subject of the Gaming Act, gaming regulation, and all of the special funds that the statute prescribes, as all such funds are products of taxes and assessments associated with gaming regulation. Petitioners, however, emphasize that the source nexus is the only tenable connection between a number of the special funds and the single subject of gaming regulation and that this nexus is insufficient to satisfy the single subject requirement of Article III, Section 3.[9] Thus, the ques-

9. These include the Pennsylvania Gaming Economic Development and Tourism Fund, 4 Pa.C.S. § 1407; designated transfers from the State

tion that we must resolve is whether such a source-only subject nexus is enough to satisfy the constitutional germaneness test.

On this subject, our decision in *Powell* is instructive. In *Powell,* an act concerning the regulation of motor vehicles included provisions regarding the disposition of the funds paid in license and registration fees. In holding that the statute did not violate Article III, Section 3, we indicated in broad terms that direction as to the disposition of fees flowed naturally from the imposition of such fees:

> The suggestion that provisions in the statute for granting licenses, and for disposing of the money received from the grant, are not germane to each other, seems to us to be without force. Having as part of the system of regulating the operation of motor vehicles on the state highways, provided for the imposition of registration and license fees, nothing would follow more naturally than a direction as to what disposition should be made of those fees.

*Powell,* 94 A. at 748–49.

Furthermore, our Court found that the disposition of monies can be germane to the single subject of the enactment and indeed such disbursement may be necessary:

> Clearly, the disposition of such fees, paid as an incident to the system of regulation, was a matter closely allied thereto, and naturally to be considered by the legislature in connection with the main purpose of the act. The statute would have been incomplete, had it required the payment of fees, without providing for any disposition of them.

*Id.* at 749.

We went on, however, in determining whether the distribution of the fees survived the single-subject challenge, to focus on the use of the monies being disbursed. The motor vehicle licensing and registration fees at issue in *Powell* were ear-

Gaming Fund to the Volunteer Fire Company Grant Program, 4 Pa.C.S. § 1408(b), transfers to entities relative to the Forest Reserves Municipal Financial Relief Law, 4 Pa.C.S. § 1408(d); and transfers to the Property Tax Relief Fund, 4 Pa.C.S. §§ 1408(e), 1409.

marked for a fund to assist in the construction and repair of highways. As the money at issue was designated specifically to a use which was related to motor vehicles, the statute was not held to be constitutionally infirm:

> In the present case, the law relates to motor vehicles, and it regulates them in a number of particulars, with the result that a number of objects are incidentally accomplished, one of which is the creation of a fund to assist in the construct and repair of highways, upon which the motors are operated. This particular object falls within the approved limits, as defined in our cases such as *Reber's Petition*, 235 Pa. 622, 84 A. 587; *Booth & Flinn, Ltd., v. Miller*, 237 Pa. 297, 85 A. 457.

*Powell*, 94 A. at 749.

 *Powell's* reasoning thus supports the notion that, to withstand single-subject challenge the designation or use of the monies collected under a statute must also be germane to the overall subject of the statute if the legislature is going to disburse funds through a single statutory enactment.[10] We

10. *Powell's* reference to *Reber's Petition* and *Booth & Flinn, Ltd.*, confirms that the foundation for the Court's reasoning was the germaneness of the specific uses to which the money was designated in relation to the overall subject of the challenged piece of legislation. *See Powell*, 94 A. at 749 ("[A]ll these objects were held to be germane to the one general subject of the legislation."). Specifically, *Reber's Petition* involved a statute that created a board of viewers to act in eminent domain cases. The enactment not only created the board of viewer positions, but also prescribed the viewers' duties, the compensation that the viewers were to receive, and fixed responsibility for their payment. In upholding a single subject challenge, our Court noted that all of these matters were "closely allied, and naturally to be considered together. They are all germane to the main purpose of the act." *Reber's Petition*, 84 A. at 589. Likewise, the appeal in *Booth & Flinn, Ltd.*, dealt with an act whose subject was the appropriation of monies to a charitable institution. . Our Court upheld a section which provided for security and lien against a single subject challenge by concentrating on the germaneness of the provision to the subject of the enactment. "It is, however, no infringement of the section if there are several provisions in the bill, provided they are connected with and germane to the one general subject of the legislation. It is sufficient if they relate to and are a means of carrying out the one general purpose of the act." *Booth & Flinn, Ltd.*, 85 A. at 458–59; *accord Yardley Mills Co. v. Bogardus*, 321 Pa. 581, 185 A. 218 (1936) (indicating, as either an alternative holding or *dictum*, that a statute that both authorized the

recognize, however, that, as with all cases, *Powell's* holding is to be read against its facts, *see Commonwealth v. McCann*, 503 Pa. 190, 469 A.2d 126, 128 (1983), and, in this regard, the case simply did not involve the source-only nexus scenario. Rather, the broader relationship between the overarching subject of the legislation and the purpose to which the special funds that it created were devoted served independently to insulate the statute from single-subject attack in *Powell*. Therefore, while the *Powell* decision is certainly informative, it is not necessarily controlling here. Moreover, some subsequent decisions are in tension with a straightforward application of *Powell's* reasoning.

For example, in *Commonwealth ex rel. Rowand v. Friebertshauser*, 263 Pa. 211, 106 A. 204 (1919), school districts challenged legislation establishing a system for licensing of dogs and control of livestock and providing for distribution of funds collected from associated fees and/or taxes to a county fund, the residue of which was to be available for general, governmental purposes. The challenge was framed under the clear-title facet of Article III, Section 3, on the theory that the title of the enactment failed to afford adequate notice that the legislation would supplant prior legislation which dedicated the revenue stream from dog and livestock regulation to public education. This Court, however, rejected that challenge. Although acknowledging that the title of the statute failed to afford any notice of the repeal of previous acts which included the disposition of the funds realized under the provisions of the statute, the Court reasoned that such disposition was merely an incident of its enforcement, and therefore, required no express mention in the title. *Id.* at 205 ("As the [relevant act] requires the payment of license fees, the disposition of such fees follows as a natural and necessary incident of its enforcement. Indeed, the legislation would be incomplete without such provision." (citing *Powell*, 94 A. at 746)).

generation of proceeds from the sale of canal lands and authorized their disbursement into a motor vehicle fund transgressed across multiple subjects).

The framing of the parties' arguments in *Rowand* around the clear-title facet of Article III, Section 3 presents some basis to distinguish the case from the focus of our discussion here, the single-subject aspect. As previously noted, however, these twin facets are substantially interrelated. Additionally, *Rowand's* rationale was expressly premised on the position that the source relationship between the disbursement of funds generated under the statute and its general subject matter was in and of itself sufficient to satisfy the single-subject concern which is embodied in Article III, Section 3. *See Rowand,* 106 A. at 205 ("The title is sufficiently comprehensive to give notice of the intent to deal with *the entire subject-matter* of licensing dogs and protecting live stock, *and necessarily the disposition of funds realized under its provisions is one of the incidents of its enforcement* and requiring no express mention in the title." (emphasis supplied)). *Rowand's* grounding in this regard is particularly apparent in light of the absence of some other relationship between the overarching subject of the statute and its disbursement of funds for general purposes of county government. *Cf. Heuchert v. State Harness Racing Comm'n,* 403 Pa. 440, 170 A.2d 332, 337 (1961) (rejecting a constitutional challenge to special funds distributions from tax proceeds associated with race-track admissions to a "Pennsylvania Fair Fund" to be allocated to county agricultural societies and independent agricultural societies conducting annual fairs or horse races, since, under *Powell,* such funds were regarded as special funds tied to the substantive legislation and not as appropriations).[11]

11. At least in the context of public initiatives, several other jurisdictions have taken a broad view of constitutional single-subject requirements relative to special funds analogous to that suggested by *Rowand.* *See In re Initiative Petition No. 363, State Question No. 672,* 927 P.2d 558, 566 (Okla.1996) (rejecting a challenge under a single-subject provision of the Oklahoma Constitution to an initiative proposing a constitutional amendment to legalize casino gambling which also earmarked revenues for specific computer-related educational purposes, local governments, and correctional institutions, reasoning that the "the elements of taxability, distribution of gaming revenue and of civil liability for debts incurred in gaming to be authorized are *germane* to the general subject of legalization and regulation of authorized casino gambling" (emphasis in original)); *Floridians Against Casino Takeover v. Let's Help Flori-*

As these decisions exemplify, and as we recognized in *City of Philadelphia*, it is plain that the Court's interpretation of Article III, Section 3 has fluctuated over time. *See id.* at 587–88; *accord City of Philadelphia v. Commonwealth*, 837 A.2d 591, 602 (Pa.Cmwlth.2003) ("The constitutional restrictions ... although plainly expressed in the text of Article III, Section 3, do not lend themselves readily to bright-line rules, as the cases over the past century and a quarter have shown, and the line between what is constitutionally acceptable and what is not is often blurred."). In this landscape, just as *City of Philadelphia* afforded us the opportunity to reflect on the variations and reevaluate Article III, Section 3's mandate as it pertains to matters of substantive legislation, this case presents a similar opportunity in the special funds arena.

 Upon such reflection, and with respect to special funds treatment in substantive legislation entailing actual authorization of monetary disbursements, we believe that the reasoning of *Powell* should control, and we reaffirm it here. The use of a single legislative enactment as a vehicle to generate and disburse funds among a wide variety of interests untethered to an overarching subject and unchecked by any other safeguard, in our view, leaves too great a potential for abuse to withstand Article III, Section 3 scrutiny. Stated differently, in such circumstances, even with the affordance of all due deference to the Legislature, the involvement of unrelated subject matter is simply too great for it to be fairly regarded as incidental or collateral to the main subject matter.

This case, however, presents a substantial nuance that is not discussed in the prior decisions, in that with regard to the

*da,* 363 So.2d 337 (Fla.1978) (holding that an initiative permitting the operation of casinos in a portion of Florida which allocated resultant income from gambling taxation to general purposes of public education and law enforcement did not violate the single-subject provision of the Florida Constitution); *Kennedy Wholesale, Inc. v. State Bd. of Equalization,* 53 Cal.3d 245, 279 Cal.Rptr. 325, 806 P.2d 1360 (1991) (upholding, against a single-subject challenge, a proposition generating tobacco tax revenue and distributing it, *inter alia,* to general healthcare for indigents and improvement of state parks and wildlife habitat). *But see State ex rel., Jensen v. Kelly,* 65 S.D. 345, 274 N.W. 319 (1937) (taking a narrower view of germaneness analogous to the reasoning of *Powell*).

most substantial special funds created under the Gaming Act, the General Assembly stopped short of providing for actual disbursement. For example, with respect to one prominent fund, the Pennsylvania Gaming Economic Development and Tourism Fund, *see* 4 Pa.C.S. § 1407, the statute expressly prescribes that all distributions must be pursuant to subsequently enacted budget. *See* 4 Pa.C.S. § 1407(b). Similarly, with regard to the Property Tax Relief Fund, *see* 4 Pa.C.S. § 1409, although the statute indicates that funds are appropriated, it is otherwise very clear that this means only that they are to be deposited into a special-purpose fund in the State Treasury, 4 Pa.C.S. § 1409(a), and are to be disbursed only under distinct legislation. *See id.* at § 1409(b). Indeed, the Legislature separately provided for such disbursement under the Homeowner Tax Relief Act, Act of July 5, 2004, P.L. 654, No. 72, 53 P.S. §§ 6925.101–6925.704. *See* 53 P.S. § 6925.505 (providing for distributions from the Property Tax Relief Fund).

The prescription for, or practical necessity of, a separate appropriation to achieve actual distribution of special funds interposes a substantial check that informs our decision concerning Article III germaneness, since such appropriations implicate the separate requirements of Article III, Section 11 of the Pennsylvania Constitution. Article III, Section 11 provides that:

> The general appropriation bill shall embrace nothing but appropriations for the executive, legislative, and judicial departments of the Commonwealth, for the public debt and for public schools. **All other appropriations shall be made by separate bills, each embracing but one subject.**

PA. CONST. art. III, § 11 (emphasis supplied); *see generally,* Ruud, 42 MINN. L.REV. at 426–28. While this Court has held that special funds are generally insulated from the constitutional requirements associated with appropriations under Article III, Section 11, *see Powell,* 94 A. at 749, where an independent appropriation is called for by the legislative scheme, such requirements are returned to the forefront. Source-only-related special funds requiring a further appropri-

ation as a prerequisite to distribution thus implicate the additional safeguards of distinct legislative review of the additional appropriation in an independent, orderly, and directed fashion,[12] as well as of the executive oversight invested in the Governor under Article IV, Section 15 of the Constitution, in the form of the power of gubernatorial veto.

Given these safeguards, we find that it is reasonable to view the earmarking, allocation, or apportionment of special funds which falls short of a full and complete appropriation, e.g., providing for actual disbursement of fund monies, as within the range of the permissible give-and-take of the legislative process, which by its nature is directed to achieving a consensus, as opposed to an example of constitutionally impermissible activity.[13] In other words, for purposes of the single-

12. For purposes of Article III, Section 11 analysis, the single subject in focus is obviously centered on the subject matter of the appropriation. In other words, the source nexus is not relevant in the Article III, Section 11 context. Cf. *Pennsylvania AFL-CIO v. Commonwealth*, 683 A.2d 691, 695 (Pa.Cmwlth.1996) (recognizing that courts have traditionally applied a substantially more expansive reading of the single subject clause outside the arena of general appropriations, as the purpose of substantive legislation is not constitutionally defined as it is relative to appropriations).

13. We recognize that there is a fairly wide range of views concerning whether, and in what circumstances, earmarking, allocation and/or apportionment of special funds constitutes an appropriation. *Compare, e.g., Washington Ass'n of Neighborhood Stores v. State*, 149 Wash.2d 359, 70 P.3d 920, 924 (2003) ("merely earmarking funds is not enough to signify an appropriation; . . . there must also be express legislative authorization for the payments of funds from the state treasury"), *and Nachman v. State Tax Comm'n*, 233 Ala. 628, 173 So. 25, 30 (1937) ("To provide that certain funds derived from particular sources shall be paid and used for designated purposes of government is in no sense an appropriation[.]"), *with Washington Ass'n of Neighborhood Stores*, 70 P.3d at 928 (Sanders, J., dissenting) (citing Black's Law Dictionary for the proposition that funds are appropriated upon earmarking by a legislative body). We need not enter this debate here, however. It is sufficient for our purposes that the General Assembly has not made a complete appropriation, such that, prior to disbursement of the special funds, it must proceed in accordance with the special appropriation provision of Article III, Section 11. *See generally Common Cause of Pa. v. Commonwealth*, 668 A.2d 190, 199 (Pa.Cmwlth.1995) (reflecting prevailing law which, at least subject to this Court's future consideration, rejects the inclusion within a general appropriations bill of a special fund appropriation that resides outside of *Powell's* reach), *aff'd per curiam*, 544 Pa. 512, 677 A.2d 1206 (1996).

subject requirement of Article III, Section 3, we are willing to accept source relation as an adequate subject-matter connection to support legislative earmarking/allocation/apportionment of special funds, and to this degree, the involvement of the targeted subjects as incidental or collateral to the main purpose. Again, however, we also believe that it would unduly dilute the constitutional single-subject requirement to rely solely on the strength of a source relation to sustain single-bill authorization of actual monetary disbursements of such funds.

Applying this construct to Petitioners' challenges under the Gaming Act, we find that although certain of the appropriations of revenues collected pursuant to the Gaming Act are germane to the single subject requirement of Article III, Section 3, certain other appropriations violate this constitutional provision as they are not germane to the single subject of the regulation of gaming under the approach discussed above.

 Specifically, in their brief, Petitioners focus their Article III, Section 3 challenge on Sections 1407, 1408, and 1409 of Chapter 14 of the Gaming Act. Section 1407 creates the Pennsylvania Gaming Economic Development and Tourism Fund. 4 Pa.C.S. § 1407(a), (c). As noted, all monies in this fund, established with the state treasury, are to be distributed pursuant to a subsequently-enacted economic development budget that appropriates money from the fund. 4 Pa.C.S. § 1407(b). Restrictions on the projects supported by this fund are contained in Section 1407(d). Specifically, no monies from this fund are to be distributed to a city or county of the first or second class for 10 years. Monies from this fund

We also do not overlook that prior decisions have sometimes de-emphasized the special apportionment provision of Article III, Section 11, either overlooking its role entirely, see, e.g., Powell, 94 A. at 749 (stating that Article III, Section 11 "was only intended to apply to the biennial appropriation made by the Legislature"), or relegating it to the status of surplusage in light of Article III, Section 3 single-subject requirement. See, e.g., Constitution Defense League v. Waters, 309 Pa. 545, 164 A. 613 (1933) (equating the single-subject provisions of Article III, Section 3 and Article III, Section 11). Our decision today reinvigorates Article III, Section 11 as it pertains to source-only-related special funds, recognizing the provision's substantial and independent role.

may, however, be used throughout the Commonwealth. During the first 10 years of the fund, monies from the fund may be used within cities and counties of the first and second class for, *inter alia,* the Pennsylvania Convention Center, the Pittsburgh International Airport, the Pittsburgh Community Infrastructure Development Fund, the Pittsburgh Urban Redevelopment Fund, and the Pittsburgh Convention Center. Although the allocations in Section 1407(b) and (d) involve uses that have no apparent relation to the subject of the regulation of gaming and thus would fail scrutiny under *Powell,* the Legislature's express prescription for a subsequent appropriation through a subsequently enacted budget implicates the Article III, Section 11 safeguard, and on this basis, we decline to deem the provision constitutionally infirm based upon its enactment via the Gaming Act.

 Section 1408 of the Gaming Act provides for transfers of monies from the State Gaming Fund to, *inter alia,* the Compulsive Problem Gambling Treatment Fund; Volunteer Fire Company Grant Program; Local Law Enforcement Grants for enforcement and prevention of unlawful operation of slot machines; counties, townships, and schools receiving payment under the Forest Reserves Municipal Financial Relief Law; and the Property Tax Relief Fund. 4 Pa.C.S. § 1408. The Property Tax Relief Fund is to be used for local property and wage relief as specified by law. 4 Pa.C.S. § 1409.

 While two of the distributions pursuant to these sections by their terms are clearly germane to the regulation of gaming, i.e., the Compulsive Problem Gambling Treatment Fund, 4 Pa.C.S. § 1408(a), and the Local Law Enforcement Grants for enforcement and prevention of unlawful operation of slot machines, 4 Pa.C.S. § 1408(c), the remaining provisions contained in Sections 1408 and the provisions contained in 1409 involve a disbursement of funds for uses bearing a source-only relation to the single subject of the regulation of gaming, and thus, fail subject-relation scrutiny under *Powell.* Since Sections 1408(b) (the transfers to the Volunteer Fire Company Grant Program) and 1408(d) (transfers to recipients

of benefits under the Forest Reserves Municipal Financial Relief Law) entail outright distributions in the nature of continuing appropriations that appear to be self-executing, we find their promulgation as part of the Gaming Act to be violative of Article III, Section 3's single subject requirement. With regard to the Property Tax Relief Fund, however, as previously noted, actual disbursement of funds is via the separate legislation embodied in the Homeowner Tax Relief Act, see supra, and, per our analysis above, we therefore deem the enactment process for Section 1408(e) and Section 1409 to have been sufficient to meet Article III, Section 3's requirements.

■ The next question we must answer is whether the provisions for distribution to the Volunteer Fire Company Grant Program and relative to the Forest Reserves Municipal Financial Relief Law which we have found to be invalid may be severed from the other provisions in Chapter 14. In making this determination, we first recognize the General Assembly's clear and expressly stated intention that the invalidity of any provision of the Act "shall not affect other provisions or applications. . . ." 4 Pa.C.S. § 1902(a). Moreover, we are cognizant of the rule that unconstitutional provisions should be severed from their constitutional counterparts unless we determine that the valid provisions are "so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one" or that the "remaining valid provisions, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent." Commonwealth v. Mockaitis, 575 Pa. 5, 834 A.2d 488, 502 (2003) (citing 1 Pa.C.S. § 1925).

■ We find that the above-discussed provisions are severable from the remainder of the Act. First, as they are not germane to the single subject of the regulation of gaming, they are clearly not essentially and inseparably connected with the rest of the Act. Second, the remaining valid provisions are

certainly capable of being executed in accordance with legislative intent in the absence of this limited number of disbursement provisions.[14]

In sum, we must uphold legislation in the face of a constitutional challenge unless it is demonstrated clearly, palpably, and plainly to violate our organic law. Keeping in mind the trepidation with which the judiciary interferes with the process by which the General Assembly enacts the laws, we conclude that as a matter of law, there was a single unifying subject to which most of the provisions of the act are germane, the regulation of gaming. We also conclude, however, for the reasons set forth above, that certain of the disbursement provisions contained in Chapter 14 of the Gaming Act are not

14. As a separate matter, we acknowledge that there are significant policy justifications militating against severance on a finding of a violation of the single-subject provision in circumstances where logrolling may have occurred. *See, e.g.,* Martha J. Dragich, *State Constitutional Restrictions on Legislative Procedure: Rethinking the Analysis of Original Purpose, Single Subject, and Clear Title Challenges,* 38 Harv J. on Legis 103, 161 (2001)(positing that, unless a reviewing court can discern that provisions outside the primary subject matter of legislation did not serve as an inducement for passage of the enactment, the court should strike the entire statute); *accord Heggs v. State,* 759 So.2d 620, 630 (Fla.2000). Many jurisdictions, however, enforce the legislative intent that severance should be accomplished even in such a context. *See, e.g., Hammerschmidt v. Boone County,* 877 S.W.2d 98, 103 (Mo. 1994); *State v. Prince Georgians for Glendening,* 329 Md. 68, 617 A.2d 586, 589–90 (1993); *State ex rel., Hinkle v. Franklin County Bd. of Elections,* 62 Ohio St.3d 145, 580 N.E.2d 767, 770 (Ohio 1991). *See generally,* 16A Am.Jur.2d *Constitutional Law* § 208 (2004)("[W]here a statute is constitutionally infirm because it contains multiple subjects, in violation of a requirement that statutes should be confined to one subject, the problem can normally be cured by severing those sections of the statute which cover extraneous subjects."); 82 C.J.S. *Statutes* § 83 (2004) ("The rule that an act incorporating more than one subject must be wholly invalidated is inapplicable where one of the subjects is the main focus of the act, while another is only secondary."). Additionally, our prevailing precedent supports severance in such circumstances. *See Payne,* 31 A. at 1072. Here, the provisions that we have found must be severed appear comparably modest in comparison to the overall character and effect of the legislation; indeed, the Legislature did not deem it necessary to include a specific referent to them in the title of the Gaming Act. Moreover, Petitioners have not asserted that our precedent should be overruled. Accordingly, we will enforce the clearly indicated legislative intent, *see* 4 Pa.C.S. § 1902, in conformance with precedent.

germane to the single subject of the regulation of gaming. Accordingly, while we hold that most of the provisions of the Gaming Act pass the single subject requirement of Article III, Section 3, pursuant to the severability provisions contained in the Gaming Act, 4 Pa.C.S. § 1902, the above noted provisions contained in Section 1408 of the Act are stricken for lack of germaneness to the single subject.

### *Section II*

In addition to the single subject requirement, Article III, § 3, as noted above, also mandates that the subject of the bill must be clearly expressed in its title:

> No bill shall be passed containing more than **one subject, which shall be clearly expressed in its title,** except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

PA. CONST. art. III, § 3 (emphasis supplied).

Petitioners first submit that the title of the one-page bill must be referred to in determining whether the current title is constitutionally defective. Petitioners then compare the title of HB 2330 as originally drafted with the new title as amended by the Senate. Combining concepts relating to clear expression of title with single subject and the overarching concept of germaneness, Petitioners assert that the "obliteration of the title and purpose of the 1–page act is fatal to the constitutionality of the amendment and removes any possibility that the amendment is germane to the purpose and subject of the 1–page act. . . ." Petitioners' Brief at p. 31. Similarly, Petitioners maintain that "the change in titles, . . . conclusively shows that § 1 and § 3 of Article III forbidding amendments which change a bill's purpose and deal with more than one subject have been violated." *Id.*

Respondents argue that Article III, Section 3 requires that the title of a law indicate its contents so that the members of the General Assembly can vote on the legislation with circumspection. In sum, Respondent's agree that Article III, Section 3 prohibits a title from being deceptive. Respondents offer

that as long as the title of the law indicates its contents, the bill satisfies its constitutional requirement of placing members of the General Assembly on notice so that they can vote on the legislation with consideration of its circumstances and consequences. Thus, according to Respondents, a violation of Article III, Section 3 occurs "only when (1) the legislators were actually deceived as to the act's contents at the time of passage; or (2) that the title on its face is such that no reasonable person would have been on notice as to the act's contents." *See, e.g.,* Respondent Commonwealth of Pennsylvania's Brief at p. 12.

Applying this standard, Respondents maintain that there is no evidence that the title of HB 2330 was deceptive. There is no assertion that legislators actually were deceived as to the contents of HB 2330. Furthermore, the final title put reasonable persons on notice as to the contents of the Gaming Act. Thus, there was no constitutional violation of Article III, Section 3's clear title requirement.

As originally introduced, HB 2330 was entitled:

AN ACT PROVIDING FOR THE DUTIES OF THE PENNSYLVANIA STATE POLICE REGARDING CRIMINAL HISTORY BACKGROUND REPORTS FOR PERSONS PARTICIPATING IN HARNESS OR HORSE RACING

The Senate amended the title of the bill prior to passage and in doing so, as pointed out by Petitioners, incorporated no part of the original title:

AMENDING TITLE 4 (AMUSEMENTS) OF THE PENNSYLVANIA CONSOLIDATED STATUTES, AUTHORIZING CERTAIN RACETRACK AND OTHER GAMING; PROVIDING FOR REGULATION OF GAMING LICENSEES, ESTABLISHING AND PROVIDING FOR THE POWERS AND DUTIES OF THE PENNSYLVANIA GAMING CONTROL DEPARTMENT OF REVENUE, THE DEPARTMENT OF HEALTH, THE OFFICE OF ATTORNEY GENERAL, THE PENNSYLVANIA STATE POLICE, AND THE PENNSYLVANIA

LIQUOR CONTROL BOARD; ESTABLISHING THE STATE GAMING FUND, THE PENNSYLVANIA RACE HORSE DEVELOPMENT FUND, THE PENNSYLVANIA GAMING ECONOMIC DEVELOPMENT AND TOURISM FUND, THE COMPULSIVE PROBLEM GAMBLING TREATMENT FUND AND THE PROPERTY TAX RELIEF FUND; PROVIDING FOR ENFORCEMENT; IMPOSING PENALTIES; MAKING APPROPRIATIONS; AND MAKING RELATED REPEALS.

■ As noted above, Article III, Section 3, mandates that the single subject contained in a bill must be "clearly expressed in its title. . . ." In *Scudder v. Smith,* 331 Pa. 165, 200 A. 601 (1938), we emphasized that the purpose of the clear title requirement was to "put the members of the Assembly and others interested on notice, by the title of the measure submitted, so they might vote on it with circumspection." *Scudder,* 200 A. at 604. "In essence, Article III, Section 3 prohibits legislative draftsmen from proposing acts with titles calculated to mislead and deceive . . . [and] assures against the practice of the intentional masking of acts with misleading or 'omnibus' titles." *Estate of Rochez,* 515 A.2d at 902.

■ Our case law interpreting this constitutional provision also makes clear, however, that it is only reasonable notice that is required. We have held that while the Constitution requires that the title of the bill be clear, it "does not require a title to be an index or synopsis of an act's contents." *Id.;* *McSorley v. Fitzgerald,* 359 Pa. 264, 59 A.2d 142 (1948); *see also DeWeese v. Weaver,* 824 A.2d 364, 372 (Pa.Cmwlth.2003)(explaining that "[t]he title serves as a signal not a précis of the bill's contents."). Indeed, to require the title to catalogue every provision of a bill might not only make the title unworkably long, but might foster the very problems that the requirement was meant to prevent.

■ Based upon the purpose behind the clear expression of title requirement, as well as the practical realization that a title does not need to express each and every subtopic

contained in the bill, we set forth the burden one must meet in order to sustain a constitutional challenge to the expression of title. "[O]ne who seeks to declare a title unconstitutional under this provision must demonstrate either (1) that the legislators and the public were actually deceived as to the act's contents at the time of passage, or (2) that the title on its face is such that no reasonable person would have been on notice as to the act's contents." *Estate of Rochez*, 515 A.2d at 902. Stated another way, a title will be held to be constitutional if it puts a reasonable person on notice of the general subject matter of the act. *Ewalt v. Pennsylvania Turnpike Commission*, 382 Pa. 529, 115 A.2d 729 (1955).

▆▆▆ Looking at the title of the Gaming Act, and comparing the substance of the Act to its title, we believe that Petitioners have failed as a matter of law to show that the title is violative of Article III, Section 3. There is no allegation that any legislator actually was deceived as to the contents of HB 2330. Furthermore, the title passes constitutional muster as it clearly puts a reasonable person on notice of the general subject matter of the Act. Specifically, the Act covers a variety of subtopics regarding the subject of gaming: the Gaming Control Board; Licensees; Revenues, including the establishment of a number of funds; administration and enforcement of the provisions of the Act; making appropriations, and repealing certain acts and parts of acts. Each of these primary subtopics is set forth in the title by clear expression.

Therefore, with the strong presumption regarding the constitutionality of legislation and considering the constitutionality of the Act with all doubts being resolved in favor of a finding of constitutionality, we hold that as a matter of law, the title of the Gaming Act puts reasonable persons on notice of the subject matter contained therein, and therefore, does not run afoul of the clear expression of title requirement found in Article III, Section 3 of our Constitution.

### Section III

Next, Petitioners contend that the Gaming Act violates the "change in original purpose" prohibition of Article III, Section

1 of our Constitution. Specifically, Petitioners offer that case law suggests that Article III, Section 1 is aimed at deterring confusion, misconduct, and deception. Petitioners' Brief at p. 37. Both the original title and the amended title are deceptive, according to Petitioners, and the deception is evidenced by the "means by which this bill was hastily pushed through both the Houses of the General Assembly. . . ." Petitioners' Brief at p. 38. Related thereto, Petitioners assert that the House "was disenfranchised to the extent that virtually the entire bill could only be amended if the House rules were first suspended by a two-thirds majority vote of all members—a fact which resulted in the House being unable to amend this bill in any manner." Petitioners' Brief at p. 38. In sum, Petitioners argue that it is "the 'ramrod' element of this bill [that] provides the confusion and deception element. . . ." Petitioners' Brief at p. 39.

Suggesting that there is a lack of case law on Article III, Section 1, Petitioners point to case law from other jurisdictions in which legislation was found to be unconstitutional when an amendment to a bill changed its original purpose. *See, e.g., Advisory Opinion No. 331,* 582 So.2d 1115 (Ala.1991); *Barclay v. Melton,* 339 Ark. 362, 5 S.W.3d 457 (1999); *Black Hawk Consol. Mines Co. v. Gallegos,* 52 N.M. 74, 191 P.2d 996 (N.M.1948). Thus, because the General Assembly made numerous changes to the original bill that dealt with fingerprinting at racetracks, and according to Petitioners, changed the specific original purpose of the bill, it is violative of Article III, Section 1.

Respondents answer that the Gaming Act does not violate Article III, Section 1 because the original purpose of HB 2330 remained the same from inception to passage—to regulate gaming. While the bill was amended materially and expanded to contain additional topics, they all were related to the broad and original purpose of regulating gaming. Respondents maintain that our Court has been hesitant to strike legislation due to an alleged change in purpose. Recognizing that the legislative process often requires material changes to legislation during its passage, Respondents contend that our Court

has held that an Article III, Section 1 challenge will be rejected if "the bill in final form, with a title that clearly stated its contents, was presented to each house for its consideration and adoption." *Consumer Party v. Commonwealth,* 510 Pa. 158, 507 A.2d 323, 335 (1986). The Gaming Act, according to Respondents, clearly passes this test, and even if the initial and finally passed versions of the bill are compared, the purpose, at its origin and final passage, were both to regulate gaming.

Article III, Section 1 provides that in passage through the legislative bodies, a bill shall not be altered or amended to change its original purpose:

No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

PA. CONST. art III, § 1.

Contrary to Petitioners' assertions, our Court has spoken to the meaning of Article III, Section 1 and offered an analysis to be engaged in when considering a constitutional challenge based on this provision in *Consumer Party v. Commonwealth,* 510 Pa. 158, 507 A.2d 323 (1986). In that decision, the Court was faced with an attack on legislation that, as originally introduced, proposed changes to county codes relating to county officials of counties of the third through eighth classes. After submission to a committee, the legislation was amended significantly to contain substantially different provisions relating to the salaries and compensation of certain Commonwealth officials.

A unanimous Court, while stressing the mandatory nature of Article III, Section 1, set a very high bar for finding a violation of this provision. Our Court recognized the practical realities of passing legislation and narrowly focused the inquiry. It reached its decision that Article III, Section 1 was not violated, not by comparing the original purpose to the purpose at final passage, but by considering only the bill at final passage. Consistent with this concentration, our Court inquired as to whether the legislation put the members of the

General Assembly and others interested on notice so that they could "act with circumspection." *Id.* at 335. As stated by the Court, "here the bill in final form with a title that clearly stated its contents, was presented to each house for its consideration and adoption. Under these circumstances, there is no basis for sustaining a challenge under Article III, Section 1." *Id.*

The Court went on to address the challengers' contention, like that argued by Petitioners *sub judice*, that the procedure utilized deprived other interested parties of notice and prevented members of the Legislature from voting with circumspection. The Court rejected this argument, focusing solely on the alleged deceptive nature of the final legislation:

**As noted the title and content of the legislation in final form were in no way deceptive.** We will not assume that the majority of members in each house voting in favor of this legislation did not fully understand this piece of legislation.... **Implicitly, appellants are seeking to extend the language of Article III, section 1 to provide for a sufficient time frame during consideration of the measure in its ultimate form for communication between the constituency and the legislator before a vote is taken. There is nothing in the language of Article III, section 1 that would support such an interpretation.**

*Id.* (emphasis supplied).

Thus, the Court strictly limited its review in a challenge brought pursuant to Article III, Section 1 by viewing the title of the legislation and its content in final form. Ultimately, the Court found that the legislation did not violate Article III, Section 1.

This limited construct employed by the Court in *Consumer Party,* however, has not always been strictly and faithfully followed by our lower courts. Indeed, the Commonwealth Court has considered a challenge under Article III, Section 1 by comparing the initial and finally passed versions of a piece of legislation. *See Common Cause v. Commonwealth,* 710 A.2d 108 (Pa.Cmwlth.1998), *aff'd,* 562 Pa. 632, 757 A.2d 367

(2000). Furthermore, scholarship has criticized the narrow approach taken in *Consumer Party*. Robert F. Williams, *Statutory and Constitutional Interpretation: State Constitutional Limits on Legislative Procedure: Legislative Compliance and Judicial Enforcement,* 48 U. PITT. L.REV. 797, 815 (1987)(suggesting that *Consumer Party* unduly narrowed the scope of the constitutional restriction by focusing on deception and failed to recognize the broader purpose of preserving a "regularized legislative procedure").

Upon closer inspection of our now close to twenty-year-old decision, we find that the analysis offered in *Consumer Party* resembles the analysis set forth for reviewing challenges under Article III, Section 3 and fails to give full significance to the language employed in the constitutional provision itself— "change its original purpose." This verbiage certainly suggests a comparative analysis, that is, some form of comparison between an "original" purpose and a final purpose to determine whether an unconstitutional alteration or amendment has occurred so as to change the original purpose of the bill. It also suggests an aim broader than just ensuring that the title and contents of the final bill are not deceptive, but also includes a desire for some degree of continuity in object or intention. Accordingly, we believe that the language adopted by the conventioneers, as well as their purpose in adopting Article III, Section 1 counsel towards, and are best served by, an analytical construct that involves comparison between the original purpose and the final purpose of the bill, as well as consideration of whether the final bill and title are deceptive.

██ Thus, we now hold that a court entertaining a challenge to legislation under Article III, Section 1 must conduct a two-part inquiry. First, the court will consider the original purpose of the legislation and compare it to the final purpose and determine whether there has been an alteration or amendment so as to change the original purpose. Second, a court will consider, whether in its final form, the title and contents of the bill are deceptive.

Regarding the determination of the original purpose of the legislation, we recognize the realities of the legislative process which can involve significant changes to legislation in the hopes of consensus, *see Consumer Party* at 334, and the "expectation" that legislation will be transformed during the enactment process. *Pennsylvania School Boards Ass'n.*, 805 A.2d at 489. Furthermore, our Court is loathe to substitute our judgment for that of the legislative branch under the pretense of determining whether an unconstitutional change in purpose of a piece of legislation has occurred during the course of its enactment. *See Consumer Party; Common Cause*, 668 A.2d at 198. For these reasons, we believe that the original purpose must be viewed in reasonably broad terms.

Consistent with our suggestion in *City of Philadelphia*, it is helpful for a reviewing court to hypothesize, based upon the text of the statute, as to a reasonably broad original purpose. *City of Philadelphia*, 838 A.2d at 588. Given this approach of considering a reasonably broad original purpose, the General Assembly is given full opportunity to amend and even expand a bill, and not run afoul of the constitutional prohibition on an alteration or amendment that changes its original purpose. The original purpose is then compared to the final purpose and a determination is made as to whether an unconstitutional alteration or amendment, on its passage through either house, has taken place so as to change its original purpose.

Regarding the second prong of this analysis, it will be for the court to determine whether in its final form, the title and contents of the bill are deceptive. If the legislation passes both the purpose comparison and deception inquiries, it will pass constitutional muster.

Applying this construct to the facts of the case, we first consider the original purpose of the bill, and do so in reasonably broad terms; we then compare the original purpose to the final purpose to determine if the purpose has changed. As introduced, HB 2330 provided the State Police with the power and duty to perform criminal background

checks on, and identify through conducting fingerprinting, those applicants seeking a license from the State Horse Racing and State Harness Racing Commissions. Considering the original purpose in reasonably broad terms, we believe that here, and in this instance akin to our finding above regarding a single unifying subject, the original purpose of the bill was to regulate gaming. As finally passed, although significantly amended and expanded, we find that the primary objective of the legislation was to regulate gaming. *See* 4 Pa.C.S. § 1102(1). Based on the above, we conclude that the bill was not altered or amended to change its original purpose.

As to the second prong of the analysis, we consider whether the title and the content of the bill in final form were deceptive. Consistent with our finding above regarding the sufficiency of the title, we find that the final title was not deceptive. It placed reasonable persons on notice of the subject of the bill. Furthermore, we find that while amendments to HB 2330 were substantive and came at the end of the consideration cycle, the contents of the bill were not deceptive.

Thus, recognizing that a statute must be upheld unless it clearly, palpably, and plainly violates the Constitution, we hold, as a matter of law, that the process by which HB 2330 became law did not violate Article III, Section 1's prohibition on alteration of amendment so as to change the original purpose of the bill.

### Section IV

██ Petitioners assert in the fourth count of the Complaint that the Gaming Act violated Article III, Section 4 of the Pennsylvania Constitution, entitled "Consideration of Bills." Article III, Section 4 states that:

**Every bill shall be considered on three different days in each House.** All amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill and before the final vote is taken, upon written request addressed to the presiding officer of either House by at least twenty-five percent of the members elected to that House, any bill shall be read at length in that House.

No bill shall become a law, unless on its final passage the vote is taken by yeas and nays, the names of the persons voting for and against it are entered on the journal, and a majority of the members elected to each House is recorded thereon as voting in its favor.

PA. CONST., art. III, § 4 (emphasis supplied).

Petitioners have alleged that the version of HB 2330 that was considered in each House was completely different from the bill that was amended and changed upon third consideration in the Senate and sent to the House for final passage or concurrence. They claim that the final form of the bill that was considered was so fundamentally different from the bill that was previously considered on five readings that it was effectively a different bill. They contend that the form of the bill that was considered on the last day was not considered on three separate occasions by each house in violation of Article III, Section 4.

Respondents filed preliminary objections to the fourth count, asserting that the Gaming Act received readings on three separate days in the House and the Senate as required. Respondents assert that Article III, Section 4 does not require the Legislature to reconsider a bill after amendment.

As noted above, the Gaming Act was introduced as HB 2330 on February 3, 2004. The bill received its first reading in the House on March 16, 2004. The second reading was on March 17, 2004, and the third reading was on March 22, 2004. The Clerk of the House then presented the bill to the Senate. The bill received its first reading in the Senate on March 23, 2004, and its second reading on March 29, 2004. The bill subsequently was amended and received its third reading on July 1, 2004.

"[A]n amended bill need not be referred to committee and considered on those separate days if the amendments are germane to, and do not wholly change, the general subject of the bill." *Pennsylvania AFL–CIO v. Commonwealth of Pennsylvania*, 691 A.2d 1023, 1037 (Pa.Cmwlth.1997) (citations omitted), *aff'd*, 563 Pa. 108, 757 A.2d 917 (2000). As Petition-

ers claim that Article III, Section 4 was violated because the substance of the bill had been altered by the amendments, they must necessarily establish that Article III, Section 1 or 3 had been violated. Petitioners have failed to establish a violation of Article III, Section 1 or 3, except as noted above, and the record demonstrates that the bill was read on three separate occasions in each house. Thus, with the exception of the provisions noted above, we find that Petitioners have failed to state a claim that Article III, Section 4 was violated.

### Section V

In the fifth count of the Complaint, Petitioners have asserted that the Gaming Act violated Article III, Section 6 because the Act repealed Section 493(29) of the Liquor Code, 47 P.S. § 4–493(29), and 18 Pa.C.S. § 5513(a) of the Crimes Code, but failed to contain the text of the sections to be repealed. Section 1903 of the Gaming Act, relating to repeals, provides:

(a) Inconsistent.—The following acts and parts of acts are repealed as follows:

(1) Section 493(29) of the act of April 12, 1951 (P.L. 90, No. 21), known as the Liquor Code, is repealed absolutely.

(2) The provisions of 18 Pa.C.S. § 5513(a) are repealed insofar as they are inconsistent with this part.

(b) General.—All other acts or parts of acts are repealed insofar as they are inconsistent with this part.

4 Pa.C.S. § 1903.

Specifically, Section 493(29) of the Liquor Code provided that it shall be unlawful:

[f]or any licensee that has obtained a license to conduct thoroughbred or harness horse race meetings respectively with pari-mutuel wagering from either the State Horse Racing Commission pursuant to the act of December 17, 1981 (P.L. 435, No. 135), known as the "Race Horse Industry Reform Act," and that has obtained a slot machine license, or any employe, servant or agent of such licensee, to give away free of charge or below cost any liquor or malt or brewed beverage as a customary practice.

47 P.S. § 4–493(29) (repealed).[15] The repealed provision of the Crimes Code made it a criminal offense for a person to intentionally or knowingly make, assemble, set up, maintain, sell, lend, lease, give away, or offer for sale, loan, lease of gift "any punch board, drawing card, **slot machine** or any device to be used for gambling purposes, except playing cards." 18 Pa.C.S. § 5513(a)(1) (emphasis added).

Article III, Section 6, relating to "revival and amendment of laws," states that:

> [n]o law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revived, amended, extended or conferred shall be re-enacted and published at length.

PA. CONST., art. III, § 6.

Our Court has suggested as a general proposition that one of "the purpose[s] of Section 6 of the Constitution, along with other provisions pertaining to legislation in Article III of the Constitution, was to provide full notice and publicity to all proposed legislative enactments, and thus to prevent the passage of 'sneak' legislation." *L.J.W. Realty Corp. v. Philadelphia,* 390 Pa. 197, 134 A.2d 878, 882 (1957). " 'The constitution does not make the obviously impracticable requirement that every act shall recite all other acts that its operation may incidentally affect, either by way of repeal, modification, extension or supply.' " *Id.*

▆▆▆ Nevertheless, by its terms, Section 6 suggests more than just mere notice of alterations of other legislative enactments in some general sense. As we stated in *Commonwealth v. Hallberg,* 374 Pa. 554, 97 A.2d 849 (1953):

> [t]he object of the Constitutional provision ... is obvious, namely, to enable both the legislators themselves and all persons interested in the legislation to see exactly the changes made between the existing law and the re-enact-

15. Respondents note that Section 493(29) was enacted before the General Assembly had authorized slot machine licenses. They state that the explanation given was that legislation pending prior to its enactment had created an expectation that slot machine licenses were going to be authorized.

ment, without the necessity of referring to the former for comparison . . ., whereas if the portion to be abrogated were simply deleted, it would be impossible to determine whether such deletion represented an actual legislative intention to abrogate such part of the law or was due to a mere error or oversight in the publication of the amendatory legislation. We are strengthened in this conclusion by the well-known, uniform practice, long existent, of legislative draftsmen thus to place in brackets all parts of an existing law intended to be abrogated, as well as by the general understanding that such abrogation is to be deemed to occur only when so indicated.

*Id.* at 851–52 (citation omitted).

Thus, we hold that Article III, Section 6 requires, with regard to a directed, specific repealer, the effectuation of which is not otherwise apparent from the associated bill, that as much of the law that is expressly repealed by the bill must be published at length. In this way, legislators may see the elimination of particular existing legislative provisions, from the face of a pending bill, without having to refer to the existing piece of legislation for comparison. Here, HB 2330 amended Section 493 of the Liquor Code by specifically repealing subsection 29 of that section. Section 493 was not republished in HB 2330. Based upon the above, we find that Article III, Section 6 requires that at a minimum, subsection 29 of Section 493 should have been set forth in its entirety with brackets surrounding the text of subsection 29 indicating its repeal.

Section 1903(a)(2), which references potential inconsistencies between the bill and the Crimes Code, does not violate the requirements of Article III, Section 6, however, as this section is simply implementing a general repeal of any inconsistent legislation. Indeed, in light of section (b), enacting a general repealer of all inconsistent statutes, subsection (a)(2) is arguably superfluous. Thus, we hold that Section 1903(a)(1) of the Act which attempted to repeal Section 493(29) of the Liquor Code is violative of Article III, Section 6 and therefore,

is invalid. Further, we find that Section 1903(a)(2) of the Act did not violate the requirements of Article III, Section 6.

## Section VI

Petitioners have alleged in the sixth count of their complaint that the enactment of the bill violated Article III, Section 10. Article III, Section 10 provides that "[a]ll bills for raising revenue shall originate in the House of Representatives but the Senate may propose amendments as in other bills." PA. CONST. art. III, § 10. Petitioners claim that, although the bill originated in the House, it never became a revenue bill until it was amended on its fifth and last legislative reading in the Senate. They argue that neither the General Assembly, nor the public had notice of the contents of HB 2330, and that the General Assembly did not have the opportunity to vote with circumspection.

Respondents assert that the bill complied with the requirements of Article III, Section 10 because it originated in the House of Representatives and, in any event, was not a revenue-raising bill. They contend that any amendments to the bill, including those relating to revenues generated by gaming regulation, did not transform the bill regulating gaming into a revenue bill. Respondents further offer that the constitutional provision is a procedural directive, and that any alleged failure to comply with the directive does not present a justiciable question, citing *Mikell v. Philadelphia School District*, 359 Pa. 113, 58 A.2d 339 (1948).

We will first address Respondents' non-justiciability argument and their reliance upon *Mikell*. In *Mikell*, the plaintiff sought to enjoin the enforcement of an act that amended the Public School Code by imposing a personal property tax upon residents of first class school districts for public school purposes. The plaintiff challenged the act as a revenue-raising measure that had originated in the Senate in violation of Article III, Section 14 of the Pennsylvania Constitution of 1874. Article III, Section 14 was identical to Article III, Section 10 of our current Constitution.

We rejected the plaintiff's claim that Article III, Section 14 had been violated, finding that the act was not a revenue-raising measure. We explained that "[t]o qualify as a bill within the purview of the cited constitutional provision, at least the revenue derived from the tax imposed should be coverable into the treasury of the exacting sovereign for its own general governmental uses, and that is not the situation in the present instance." *Mikell,* 58 A.2d at 341. The personal property tax was imposed for the maintenance of the public school system, rather than for the Commonwealth's governmental purposes.

We observed that:

> there can be no suggestion that any part of the tax imposed by the Act will be used for the State's governmental purposes.... [T]he impost is laid upon personal property of residents of designated school districts and the taxes collected will be used for public school purposes within such districts. The Act so stipulates. It is true that the described personal property is directly made taxable by the Act, but the annual levy, within the statutorily specified maximum and minimum limits, is a matter for the independent action of the respective boards of public education of the designated districts.

*Id.* at 343.

We determined that there was an additional barrier to plaintiff's challenge to the enactment of the personal property tax because "[t]he clause concerning the place of origin of a bill for raising revenue is a procedural directive and not a substantive interdict" and thus, was non-justiciable. *Id.* at 345.

> The provision in question could not reasonably be deemed other than directory. It is not a denial of the Senate's power as a coordinate and essential branch of the legislature. Indeed, a further clause of the same Article and Section expressly confirms the Senate's own important function and discretion in the due enactment of revenue legislation. Specifically, "the Senate may propose amendments as

in other bills": Art. III, Sec. 14 [1874]. In pursuance of its appropriate power in such regard, the Senate may amend a House revenue bill even to the extent of striking out everything following the enacting clause and substituting therefore a bill of its own creation. It follows, therefore, that a revenue statute, once enacted, is not inherently defective simply because the bill originated in the Senate and was passed first by that body.

*Id.* at 344. "A failure of the legislature to follow a directory provision of the Constitution, respecting the introduction and passage of legislation, does not present a justiciable question, and in no event, does it impair the validity of a duly certified enactment." *Id.*

In this case, Petitioners acknowledge that the *Mikell* analysis would preclude this Court from addressing their constitutional challenge based upon Article III, Section 10. They submit, however, that when a bill raising revenue by applying a tax *de facto* originates in the Senate under the circumstances presented here, Article III, Section 10 lends additional support for striking down the statute as unconstitutional. Petitioners' challenge to the bill premised upon Article III, Section 10 must stand on its own, however.

Although the parties primarily focus upon this Court's analysis in *Mikell*, which narrowly construed the authority of the judiciary to review constitutional challenges to enrolled bills, subsequent decisions reflect an evolving approach by our Court to the application of the non-justiciability doctrine. First, in *Consumer Party*, we determined that any "mandatory" provision of Article III would be enforceable, particularly where the parties agree on the relevant facts. *Consumer Party*, 507 A.2d at 333–34. Furthermore, a constitutional provision is mandatory when it "clearly sets forth the manner in which something shall be done," so that "that procedure must be followed to the exclusion of all others." *City of Philadelphia*, 838 A.2d at 581. Indeed, in *City of Philadelphia*, we recognized that *Consumer Party* modified the *Mikell* abstention doctrine:

while this Court did for many years adhere to a strict doctrine preventing it from considering matters of form in the passage of legislation, *see Kilgore [v. Magee]*, 85 Pa. [401] at 412 (stating that, "when a law has been passed and approved and certified in due form, it is no part of the duty of the judiciary to go behind the law as duly certified to inquire into the observance of form in its passage."); *Mikell v. School Dist. of Phila.*, 359 Pa. 113, 123–27, 58 A.2d 339, 344–46 (1948); *Perkins v. City of Phila.*, 156 Pa. 539, 554, 568, 27 A. 356, 362 (1893); WOODSIDE, PA. CONSTITUTIONAL LAW, at 348 ("The courts will not go back of the signatures of [the presiding officers and the Governor] to determine whether the bill was enacted in compliance with the constitutional requirements."), this rule has been modified in recent years so that the appropriateness of judicial abstention now depends upon the situation presented. *See generally Pennsylvania Sch. Bds. Ass'n*, 569 Pa. [436] at 454, 805 A.2d [476] at 486–87; *Consumer Party [of Pa. v. Commonwealth]*, 510 Pa. [158] at 177, 507 A.2d [323] at 333; David B. Snyder, Note, *The Rise and Fall of the Enrolled Bill Doctrine in Pennsylvania*, 60 TEMPLE L.Q. 315, 326 (1986). In *Consumer Party*, most notably, this Court explained that, although the need to exercise restraint in deference to a co-equal branch of government often militates in favor of abstention, "the countervailing concern is our mandate to insure that government functions within the bounds of constitutional prescription." *Consumer Party*, 510 Pa. at 177, 507 A.2d at 333.

*Id.*, 838 A.2d at 580.

 Applying the analysis articulated in *City of Philadelphia*, we find that the Constitution clearly states that "[a]ll bills for raising revenue shall originate in the House...." PA. CONST. art. III, § 10. As the parties have agreed upon the relevant facts, we determine that the claim is justiciable.

 Turning to the merits of the dispute, we find that the bill did not violate the requirements of Article III, Section 10. In essence, Petitioners claim that the bill was a revenue-

raising bill that originated *de facto* in the Senate. Regardless of whether Petitioners' characterization of the bill is correct, the bill in fact originated in the House and the proposal of amendments thereto by the Senate was permissible. Petitioners have failed to establish that Article III, Section 10 was violated.

## Section VII

 Petitioners have asserted that the enactment of the bill violated Article II, Section 1 of the Constitution, which provides that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." PA. CONST. art. II, § 1. Specifically, Petitioners challenge Section 1506 of the Act, relating to local land use pre-emption.

Section 1506 provides: [16]

The conduct of gaming as permitted under this part, including the physical location of any licensed facility, shall not be prohibited or otherwise regulated by any ordinance, home rule charter provision, resolution, rule or regulation of any political subdivision or any local or State instrumentality or authority that relates to zoning or land use to the extent

16. In his Brief in Support of Preliminary Objections, Robert C. Jubelirer, President *Pro Tempore* of the Senate of the Commonwealth of Pennsylvania, asserts that Petitioners have failed to state a claim upon which relief may be granted because Section 1506 was amended effective December 1, 2004 by SB 1209, PN 1997. He states that SB 1209, PN 1997 became law on December 1, 2004, when Governor Rendell failed to veto the bill.

Senator Jubelirer states that Governor Rendell purported to veto the bill by returning SB 1209, PN 1997, with his objections, to the Senate on November 30, 2004. He claims that the veto was ineffective because it referred to SB 1209, Printer's No. 194 7, rather than to Printer's No. 199 7. He argues that SB 1209, PN 1997 became law on December 1, 2004, and that the bill significantly amended the language of Section 1506. He contends that by failing to challenge the current amended section 1506, Petitioners have failed to state a claim upon which relief can be granted.

Despite Senator Jubelirer's position on the efficacy of the gubernatorial veto, SB 1209, PN 1997 has been recorded as having been vetoed. We take no position on this matter, but note only that Petitioners' challenge to Section 1506 as originally enacted will be addressed for this reason.

that the licensed facility has been approved by the board. The board may, in its discretion consider such local zoning ordinances when considering an application for a slot machine license. The board shall provide the political subdivision, within which an applicant for a slot machine license has proposed to locate a licensed gaming facility, a 60–day comment period prior to the board's final approval, condition or denial of approval of its application for a slot machine license. The political subdivision may make recommendations to the board for improvements to the applicant's proposed site plans that take into account the impact on the local community, including, but not limited to, land use and transportation impact. This section shall also apply to any proposed racetrack or licensed racetrack.

4 Pa.C.S. § 1506.

Petitioners assert that Section 1506 is an impermissible grant of legislative authority to the Gaming Control Board because the General Assembly has unconstitutionally empowered the Board to act like a super-zoning board or authority with unlimited and unfettered discretion. Petitioners allege that the General Assembly has failed to establish definite, reasonable, and lawful standards to guide, limit, and govern the authority of the Board. Petitioners claim that they are deprived of the reasonable, appropriate, and lawful exercise of comprehensive zoning and land use laws within their communities in connection with the operation and siting of licensed gambling facilities under Section 1506.

Petitioners assert that the Gaming Control Board has been granted exclusive and unfettered power in approving and authorizing the location and operation of licensed gambling facilities without regard to the local and state zoning and land use laws that have been enacted for the health, safety, and welfare of the respective local community. They argue that, while Section 1506 provides that the Gaming Control Board "may, in its discretion, consider such local zoning ordinances when considering an application for a slot machine license," and require the Board to provide a 60–day comment period prior to final approval, the Board is not mandated to take any

action based upon the same. Petitioners contend that the statement of legislative intent set forth in Section 1102(10) of the Act, that "[t]he public interest of the citizens of this Commonwealth and the social effect of gaming shall be taken into consideration in any decision or order made pursuant to this part," provides no meaningful guidance in deciding where to locate slot machine casinos.

Respondents argue that Section 1506 does not entrust the Gaming Control Board with unfettered authority, but merely provides that approved licensees may be exempt from local land use or zoning ordinances. They assert that Section 1102 of the Act sets forth eleven different paragraphs outlining the General Assembly's stated intent and objectives to guide the Gaming Control Board in its implementation and administration of the Act. Furthermore, they refer to the specific limitation on the authority of the Board set forth at Section 1505, which provides:

Neither the Commonwealth nor any political subdivision thereof shall have the right to acquire, with or without compensation, through the power of eminent domain any property, easement or land use right for the siting or construction of a facility for the operation of slot machines by a slot machine licensee.

4 Pa.C.S. § 1505.

Respondents also assert that the Act establishes primary standards and imposes upon the Board the duty to carry out its declared legislative policy. They contend that the standards restraining the exercise of the delegated administrative functions are contained within: (1) the statement of the objectives to be served set forth in 4 Pa.C.S. § 1102(1) ("The primary objective of this part to which all other objectives are secondary is to protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful."); (2) the extensive procedures for the gaming license application process and standards the Board should consider in deciding whether to grant gaming licenses; and (3) the primary standards for the Board to consider in selecting the location of gaming facilities.

Respondents argue that the Board must exercise its discretion within the parameters of the licensee eligibility standards set forth in Sections 1302 through 1305 of the Act, 4 Pa.C.S. §§ 1302–1305. In conjunction with the eligibility standards, the Act authorizes the Board to conduct background investigations of prospective or existing licensees, 4 Pa.C.S. § 1202(b), and identifies additional criteria that the Board may take into account when considering an application for a slot machine license, 4 Pa.C.S. § 1325(c). For example, Section 1325(c)(1) provides that the Board may take into consideration "[t]he location and quality of the proposed facility, including, but not limited to, road and transit access, parking and centrality to market service area." 4 Pa.C.S. § 1325(c)(1).

Respondents contend that those provisions illustrate the standards, guidelines, and factors within which the Board may exercise its discretion in the licensing, regulation and policing of all activities involving gaming. In effect, Respondents argue that the eligibility requirements and additional criteria considered in the process of issuing a license are sufficiently restrictive as to establish standards when the zoning ordinances for a potential site are considered by the Board.

In *Blackwell v. State Ethics Commission*, 523 Pa. 347, 567 A.2d 630 (1989), we addressed the concept of legislative power embodied in Article II, Section 1:

The "legislative power" in its most pristine form is the power "to make, alter and repeal laws." It is *axiomatic* that the Legislature cannot constitutionally delegate the power to make law to any other branch of government or to any other body or authority. The legislature may, consistent with this constitutional axiom, delegate authority and discretion in connection with the execution and administration of a law; it may establish primary standards and impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the enabling legislation.

While the General Assembly may, with adequate standards and guidelines, constitutionally delegate the power and authority to execute or administer a law, the prohibition

against delegation of "legislative power" requires that the *basic policy choices* be made by the General Assembly. *Blackwell,* 567 A.2d at 636–637 (citations omitted) (emphasis original).

In *Tosto v. Pennsylvania Nursing Home Agency,* 460 Pa. 1, 331 A.2d 198 (1975), we rejected a claim that the Nursing Home Loan Agency Law involved an unconstitutional delegation of legislative power. The law was enacted to address the legislative concern that many nursing homes were unable to provide safe and healthy accommodations for their residents and that private financing of safety improvements was not readily available. The law established the Pennsylvania Nursing Home Loan Agency, which was given the authority to make loans to nursing homes for repair, reconstruction, and rehabilitation. The plaintiff asserted that the law involved an unconstitutional delegation of legislative power because the Legislature had not made basic policy choices that would serve as standards to guide and restrain the exercise of discretion.

We determined that the standards requirement had been satisfied, stating that:

> [t]he entire Law reveals that the agency's policy decisions must be directed to the effectuation of the Legislature's basic policy of assisting nursing homes that do not comply with the Life Safety Code and are unable to achieve compliance through private sources of financing, which assistance is to be given with prudence for the protection of the loan fund. This pervasive general policy is clearly sufficient to satisfy the constitutional requirement that "basic policy choices" be made by the Legislature. But the Law goes even further. It provides very specific definitions of pivotal statutory terms and detailed guidelines for certain important agency decisions. We have no doubt that the standards requirement has been satisfied.

*Tosto,* 331 A.2d at 203 (footnotes omitted). We noted that the law provided numerous procedural guidelines that would protect against arbitrariness, such as requirements that the agency establish criteria for use in the determination of priority

among applicants and eligibility for loan refinancing, and that the agency develop a standard form for loan applicants.

In *Gilligan v. Pennsylvania Horse Racing Commission*, 492 Pa. 92, 422 A.2d 487 (1980), we addressed the issue of whether the Pennsylvania Horse Racing Commission exceeded its legislative authority under the Horse Racing Act in promulgating a rule setting fees to be paid to jockeys. The rule was challenged on the basis that the act did not provide express authorization to establish rates of compensation for jockeys. We ultimately determined that the Commission had acted within its grant of legislative authority.

We stated that the legislative power to confer authority and discretion upon another body in connection with the execution of a law is subject to two principal limitations: (1) the basic policy choices must be made by the Legislature; and (2) the "legislation must contain adequate standards which will guide and restrain the exercise of the delegated administrative functions." *Id.* 422 A.2d at 489 (citations omitted). We observed, that "[t]his does not mean, however, that all details of administration must be precisely or separately enumerated in the statute." *Id.*

We concluded in *Gilligan* that the act reflected a clear legislative policy to grant broad supervisory powers over thoroughbred horse racing to the Commission. The act specifically authorized the Commission to adopt rules and regulations consistent with the act to effectuate the purposes and provisions of the act. We determined that "[a] pervasive system of regulation and supervision of this *otherwise criminal activity* was thus contemplated by the Commission's broad legislative mandate, and a general rule making power was clearly and unmistakably conferred." *Id.* at 490 (emphasis in original). The expansive rule-making power was found to encompass the promulgation of rates for jockey fees.

"In determining whether adequate standards have been established, we look to the entire Act; 'we are not limited to the mere letter of the law, but must look to the underlying purpose of the statute and its reasonable effect.'" *William*

*Penn Parking Garage,* 346 A.2d at 293 (citations omitted). *William Penn Parking Garage* involved a challenge by the City of Pittsburgh to a provision of a tax act that delegated authority to the court to determine whether the tax was invalid if it was excessive and unreasonable. We rejected the City's claim that the power to find a tax invalid if excessive and unreasonable was an unconstitutional delegation of legislative power.

We found that the standards of whether the tax was excessive and unreasonable "both articulate[d] the 'basic policy choices' made by the General Assembly and serve[d] to confine the exercise of discretion, thus guarding against its arbitrary exercise." *Id.* 346 A.2d at 292. We concluded that assigning the task to the judiciary afforded substantial protections:

> The trial court must explain the grounds of its decision in a reasoned opinion which will serve as a precedent to guide decisions in future cases. Moreover, the decisions of trial courts are subject to careful review by appellate courts to insure the general consistency of their actions with one another and to confine them within their proper sphere. These safeguards provided considerable protection against "the arbitrariness of ad hoc decision making," and "injustice on account of unnecessary and uncontrolled discretionary power."

*Id.* at 291–292 (citations and footnotes omitted).

The provisions of Section 1506 stand in stark contrast to the statutory provisions in *William Penn Parking Garage* that were found to satisfy the constitutional requirements of Article II, Section 1. Section 1506 does not provide the Gaming Control Board with definite standards, policies and limitations to guide its decision-making with regard to zoning issues. While Section 1506 allows the Board in its discretion to consider local zoning ordinances when reviewing an application for a slot machine license and to provide a 60–day comment

period prior to final approval, the Board is not given any guidance as to the import of the same.[17]

Although the eligibility requirements and additional criteria guide the Board's discretion in determining whether to approve a licensee, we find that they do not provide adequate standards upon which the Board may rely in considering the local zoning and land use provisions for the site of the facility itself. We conclude that, as a matter of law, Section 1506 does not comply with the dictates of Article II, Section 1 insofar as the General Assembly has failed to provide adequate standards and guidelines required to delegate, constitutionally, the power and authority to execute or administer that provision of the Act to the Board.

█ As noted above, we may, with certain exceptions inapplicable to this challenge, sever provisions of the Gaming Act that we find to be violative of the Constitution. Thus, based upon the above, we find Section 1506 to be unconstitutional and sever it from the remaining valid provisions of the Gaming Act.

### Conclusion

In conclusion, and for the above-stated reasons, we grant, in part, Petitioners' request for relief by striking the above-stated portions of Sections 1408, 1506, and 1903(a)(1) of the Gaming Act pursuant to the Act's severability provision, 4 Pa.C.S. § 1902. Furthermore, we find that the remainder of the Gaming Act withstands Petitioners' constitutional chal-

17. Respondents have asserted that Section 1506 reflects the Legislature's intent to pre-empt local zoning regulations. We agree that Section 1506 clearly reflects the legislative intent to override local zoning and land use provisions to the extent that a licensed facility has been approved by the Board. *See Olon v. Commonwealth of Pennsylvania, Dep't of Corrections,* 534 Pa. 90, 626 A.2d 533 (1993) (finding that the General Assembly overrode local zoning ordinances that prohibited use of property for correctional facility); *Commonwealth, Dep't of General Services v. Ogontz Area Neighbors Ass'n.,* 505 Pa. 614, 483 A.2d 448 (1984) (holding a state agency is subject to local zoning restrictions absent legislative direction to the contrary). Such inquiry is separate, however, from the issue of whether the Legislature has provided constitutionally adequate standards and guidance to the Board with the purpose of effecting its declared policy.

lenge. As our decision is based on procedural grounds arising from the Constitution and the adequacy of legislative direction to the Gaming Control Board and not any absolute substantive proscription, it is obviously without prejudice to the Legislature's ability to cure the defects, via subsequent amendments that are consistent with this opinion.

Justice NEWMAN did not participate in the consideration or decision of this matter.