**PENNSYLVANIA STATE ASSOCIATION OF JURY COMMISSIONERS and Larry A. Thomson, President Pennsylvania State Association of Jury Commissioners and Elected Jury Commissioner in Butler County and Martha S. Smith, Duly Elected Jury Commissioner of Chester County and Mary Jane Dellafiora, Duly Elected Jury Commissioner for Indiana County and G. Richard Zimmerman, Duly Elected Jury Commissioner for Washington County, Petitioners**

**v.**

**COMMONWEALTH of Pennsylvania and Honorable Thomas Corbett, Governor of Pennsylvania and Honorable Linda Kelly, Attorney General of Pennsylvania, Respondents.**

Commonwealth Court of Pennsylvania.

Argued April 18, 2012.

Filed July 26, 2012.

David C. Cleaver, Chambersburg, and Samuel C. Stretton, West Chester, for petitioners.

Anthony T. McBeth, Harrisburg, for intervenor County Commissioners Association of Pennsylvania.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and LEADBETTER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge, and COVEY, Judge.

OPINION BY Judge BROBSON.

In this original jurisdiction matter, Petitioners, Pennsylvania State Association of Jury Commissioners, its President, Larry A. Thomson, and individual jury commissioners of various Pennsylvania counties (hereafter collectively "Jury Commissioners Association") seek declaratory and injunctive relief relating to Act 108 of 2011 (Act 108).[1] After the pleadings in this matter closed, the Jury Commissioners Association and Intervenor County Commissioners Association of Pennsylvania (County Commissioners)[2] filed motions for judgment on the pleadings, which are now before this Court.

The title of Act 108 describes it as an act that amends the County Code,[3] "further providing for applicability, for the abolishment of the office of jury commissioner and for sales of personal property and surplus farm products."[4] Thus, the title of Act 108 provides a description of the provisions of the County Code that it amended. The subsequent provisions of Act 108 then identify the amended provisions as Sections 102(a), 401, and 1805(b) of the County Code. The amendments have the effect of granting counties (through the county commissioners or other governing body) additional authority with regard to elected officers and contracts.[5] Specifically, Act 108 amended Section 401 of the County Code, pertaining to "Enumeration of Elected Officers," to add subsection (f), which provides county commissioners with the additional authority to abolish the office of jury commissioner in second class A counties or counties of the third through eighth class.[6] Subsection (f) provides:

lating to imposition of excise taxes by counties, including authorizing imposition of an excise tax on the rental of motor vehicles by counties of the first class; and providing for regional renaissance initiatives," in contracts, further providing *for applicability, for the abolishment of the office of jury commissioner and for sales of personal property and surplus farm products.*
(Emphasis added.)

---

1. House Bill No. 1644 of 2011, Printer's Number 2730, became Act 108 upon its enactment.

2. The Jury Commissioners Association also named Linda Kelly, the Commonwealth's Attorney General and the Honorable Thomas Corbett, Governor, as Respondents. These two individuals are no longer parties in this matter.

3. Act of August 9, 1955, P.L. 323, *as amended,* 16 P.S. §§ 101–2399.73.

4. The full text of the title provides:
 Amending the act of August 9, 1955 (P.L. 323, No. 130), entitled, as amended, "An act relating to counties of the first, third, fourth, fifth, sixth, seventh and eighth classes; amending, revising, consolidating and changing the laws relating thereto; re-

5. Section 401 of the County Code is contained in Article IV, relating to "County Officers," and Section 1805(b) of the County Code is contained in Article XXXVIII, relating to "Contracts."

6. Previously, the County Code authorized only certain third class counties to abolish the office of jury commissioner via referendum

After review of the procedures in effect within the county to ensure that lists of potential jurors are a representative cross section of the community, the governing body of a county of the second class A or third through eighth class may adopt, by a majority vote, a resolution abolishing the office of jury commissioner. Upon approval of the resolution, the office of jury commissioner shall expire at the completion of the current jury commissioners' terms of office. The resolution shall not be passed in any year in which the office of jury commissioner is on the ballot.

Act 108 also amended Section 1805(b) of the County Code, pertaining to "Sales of Personal Property and Surplus Farm Products," to provide county commissioners with additional authority to exercise their power to sell certain county property through online and electronic auctions.[7]

The Jury Commissioners Association raises several constitutional challenges to Act 108:(1) the Act violates Article III, Section 3 of the Pennsylvania Constitution by addressing more than one subject; (2) the Act violates the separation of powers doctrine and Article V, Sections 1 and 10 of the Pennsylvania Constitution; and (3) the Act violates the due process clause of the Fourteenth Amendment of the United States Constitution on vagueness grounds.

vote. *See* Section 401(a) of the County Code, 16 P.S. § 401(d).

7. Section 102(a) of the County Code pertains to "applicability" of the County Code, and it provides that "[e]xcept incidentally as in [certain enumerated Sections of the County Code] or as provided in Article XXX, [the County Code] does not apply to counties of the first, second A, or second classes:" Act 108 amends Section 102(a) of the County Code to add Section 401 of the County Code, as also amended by Act 108, to the list of enumerated provisions of the County Code that apply to counties of the first, second A, or second classes.

## I. ARTICLE III, SECTION 3 OF THE PENNSYLVANIA CONSTITUTION

■ Article III, Section 3 of the Pennsylvania Constitution provides:

No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

As our Supreme Court has noted, the "twin requirements" of Article III, Section 3 are "that each bill have only one subject, and that the subject be clearly expressed in the title." *City of Philadelphia v. Commonwealth*, 575 Pa. 542, 572, 838 A.2d 566, 585 (2003). In *City of Philadelphia*, our Supreme Court described the reasons why Pennsylvanians incorporated Article III, Section 3 into the Pennsylvania Constitution of 1874, including distrust of corporate influence upon the General Assembly and a resulting desire to make the deliberative process of legislative enactment more visible to our citizens. *Id.* at 573–74, 838 A.2d at 585–86. By adopting Article III, Section 3, Pennsylvanians sought to address a number of practices that members of the General Assembly occasionally employed to obtain passage of legislation without subjecting the legislation to an open and deliberative process.[8]

8. Such measures included "logrolling," which encompassed the inclusion in one bill of numerous distinct measures that would not be capable of passage on their own, but could be approved as a whole on the basis of the combination of the minority voters on the individual matters. Section 3 also prevented members of the General Assembly from including independent topics of legislation in a misleadingly titled bill or a title that uses a catch-all phrase, such as "and other general purposes." *City of Philadelphia*, 575 Pa. at 574, 838 A.2d at 586.

In *City of Philadelphia,* our Supreme Court reviewed the analysis that our courts have applied in cases where a party challenged legislation as violating Article III, Section 3. Legislation generally satisfies this provision, the Supreme Court noted, when provisions added to a bill "assist in carrying out a bill's main objective or are otherwise 'germane' to the bill's subject as reflected in its title." *Id.* at 575, 838 A.2d at 587. The Supreme Court surveyed the developed law on Article III, Section 3 and observed that the courts had shifted from strictly applying the test for "germaneness" to applying a more deferential approach to legislation, whereby the courts validated laws containing more than one topic "so long as those topics can reasonably be viewed as falling under one broad subject." *Id.* As the Supreme Court summarized: "While this trend is consistent in principle with some early pronouncements of this Court, it has resulted in a situation where germaneness has, in effect, been diluted to the point where it has been assessed according to whether the court can fashion a single, over-arching topic to loosely relate the various subjects included in the statute under review." *Id.* at 576–77, 838 A.2d at 587.

After reviewing many of those decisions, our Supreme Court expressed the view that "exercising deference by hypothesizing reasonably broad topics in this manner is appropriate to some degree, because it helps ensure that Article III does not become a license for the judiciary to 'exercise a pedantic tyranny over the efforts of the Legislature.'" *Id.* at 578, 838 A.2d at 588 (quoting *In re Com., Dep't of Transp.,* 511 Pa. 620, 626, 515 A.2d 899, 902 (1986)). The Supreme Court noted that some limits on such hypothesizing is necessary, because, otherwise, courts could uphold legislation no matter how diverse the topics of particular legislation. *Id.* at 578, 838 A.2d at 588. In other words, the over-arching subject test could swallow the single-subject requirement whole, rendering Article III, Section 3 inert to address the evils for which Pennsylvanians originally adopted the measure. *Id.*

The Supreme Court's analysis was ultimately guided by comparing the purposes behind the single-subject requirement (and the evils sought to be avoided by application of the requirement) to the act that was the subject of the appeal:

> Last-minute consideration of important measures, logrolling, mixing substantive provisions in omnibus bills, low visibility and hasty enactment of important, and sometimes corrupt, legislation, and the attachment of unrelated provisions to bills in the amendment process—to name a few of these abuses—led to the adoption of constitutional provisions restricting the legislative process. These constitutional provisions seek generally to require a more *open and deliberative state legislative process,* one that addresses the merits of legislative proposals in an orderly and rational manner.
>
> The legislation presently under review implicates many of the concerns quoted above. In its 127 pages, SB 1100 contains voluminous and varying provisions; many are substantial, most appeared at the last minute, and some are only hinted at in the title in the vaguest of terms (e.g., "making repeals"), if at all. Thus, if "the purpose of the constitutional requirements relating to the enactment of laws [is] to *put the members of the Assembly and other interested on notice,* by the title of the measure submitted, so that they might vote on it with circumspection," that objective was not fulfilled here.

*Id.* at 578–579, 838 A.2d at 589 (emphasis added; internal citation omitted).

The Supreme Court concluded that the statute at issue in *City of Philadelphia* failed to satisfy Article III, Section 3, noting that the legislation at issue "implicate[d] many of the concerns" underlying the adoption of this constitutional mandate. Specifically, the Supreme Court observed the "voluminous and varying provisions" of the bill and the critical failure of the title of the legislation to provide notice to legislators of the substance of the provisions. *Id.* at 579, 838 A.2d at 589. The failure of the title to reflect the various substantive proposals undermined the goals noted above, potentially inhibiting legislators from voting on the measure with "circumspection." *Id.* (quoting *Scudder v. Smith,* 331 Pa. 165, 170–71, 200 A. 601, 604 (1938)).

The Supreme Court, in seeking to discern a unifying scheme for the bill, first observed that the title of the proposed legislation stated that one of the objects of the bill was to amend Title 53 of the Pennsylvania Consolidated Statutes, which pertains generally to municipalities. The Supreme Court noted that, while the body of the bill contained provisions affecting municipalities either directly or indirectly, there was "no single unifying subject to which all of the provisions of the act are germane." *Id.* at 579, 838 A.2d at 589. As examples of provisions of the bill, and considering whether the provisions constituted "disparate subjects" that are "parts of a unifying scheme to accomplish a single purpose," the Supreme Court contrasted a provision restricting political activities of police officers with another provision that authorized parking authorities to undertake mixed-use development projects, and observed that there did not appear to be any logical or legislative nexus between the two provisions. *Id.*

The Supreme Court also rejected the proffered defense that all the provisions related to the subject of "municipalities:"

> [A]s virtually all of local government is a 'municipality,' we find that proposed subject too broad to qualify for single-subject status under Article III, Section 3 ... "municipalities" is the subject of an entire Title of the Pennsylvania Consolidated Statutes. By purporting to make general and diverse changes to that topic, with no other qualifications, SB 1100 is in substance an omnibus bill, whether or not it is called that in name.

*Id.* at 580, 838 A.2d at 589.[9]

Our Supreme Court recently issued another significant decision involving a challenge under Article III, Section 3 dealing with a challenge to the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1101–1904 (Gaming Act). In *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth of Pennsylvania,* 583 Pa. 275, 877 A.2d 383 (2005) (*PAGE*), the bill that eventually became the Gaming Act began as a one-page bill from the House of Representatives, relating solely to the delegation to the Pennsylvania State Police of the duty and power to perform criminal history checks and verification of fingerprints for horse industry licensure applicants. After three considerations by the House and two considerations by the Senate, the Senate amended the bill and changed the title of the bill to reflect the amendments. The amended bill grew from one page to 145 pages, including seven chapters and 86 sections. The amended bill created the Pennsylvania Gaming Control Board and

---

9. The Court also noted that it would have held the legislation unconstitutional under Article III, Section 3 of the Pennsylvania Constitution even if it had not concluded that "municipalities" is too broad a topic, because one of the provisions related to the Pennsylvania Convention Center, which is an instrument of the Commonwealth, not a municipality. *Id.*

provided for the creation of slot machine casinos, the issuance of gambling licenses, the distribution of revenue generated through gambling, the creation of various funds (one of the most notable of which was the Tax Relief Fund), and provisions relating to administration and enforcement and judicial review of disputes.

In *PAGE*, the Supreme Court observed that the "twin directives" of Article III, Section 3—clear expression of the subject of the legislation in the title of a bill and limitation in the text of a bill to a single subject—are interrelated, but they require separate analysis. *PAGE*, 583 Pa. at 294, 877 A.2d at 394. The Supreme Court concluded that, unlike the broad subject "municipalities," which could have encompassed a limitless number of subjects, the legislation at issue in *PAGE* involved "a single unifying subject—the regulation of gaming." *Id.* at 297, 877 A.2d at 396.

Our Supreme Court set forth the burden associated with a claim that legislation failed to satisfy the requirement that the subject of a bill be clearly expressed in the title of a bill. A party seeking to have legislation deemed invalid based upon a claim the title of a bill fails to comply with this aspect of Article III, Section 3 must demonstrate "either (1) that the legislators and the public were actually deceived as to the act's contents at the time of passage,

or (2) that the title on its face is such that no reasonable person would have been on notice as to the act's contents." *Id.* at 313, 877 A.2d at 406 (quoting *Estate of Rochez*, 511 Pa. at 627, 515 A.2d at 902). In *PAGE*, our Supreme Court concluded that the challengers to the Gaming Act failed to demonstrate either of these criteria, because the underlying complaint did not include allegations that the title to the Gaming Act actually deceived any legislator as to the contents of the bill and the title provided reasonable persons with notice of the general subject matter of the bill. *Id.* at 313, 877 A.2d at 406.[10]

In this case, the General Assembly's passage of House Bill 1644 likewise complies with these requirements for a bill's title. At the time of the passage, the title specifically referred to the two key provisions contained in the text of the legislation: "abolishment of the office of jury commissioner and sales of personal property and surplus farm products." The complaint contains no averments suggesting that the title deceived legislators or the public at the time House Bill 1644 was passed. Also, as a matter of law, we conclude that the title to the legislation placed reasonable persons on notice regarding the contents of House Bill 1644.

■ Having concluded that Act 108 of 2011 does not violate the title require-

---

10. The Supreme Court, however, also concluded that the disbursement scheme contained in the legislation failed to satisfy Article III, Section 3:

The use of a single legislative enactment as a vehicle to generate and disburse funds among a wide variety of interests untethered to an overarching subject and unchecked by any other safeguard, in our view, leaves too great a potential for abuse to withstand Article III, Section 3 scrutiny. Stated differently, in such circumstances, even with the affordance of all due deference to the Legislature, the involvement of unrelated subject matter is simply too great

for it to be fairly regarded as incidental or collateral to the main subject matter.

*Id.* at 303, 877 A.2d at 400. The Supreme Court upheld some of the provisions of the Gaming Act relating to the creation of special funds, where the legislation left discretion and means for distribution of funds for a later legislative act. The Supreme Court held that "[g]iven these safeguards, we find that it is reasonable to view the earmarking, allocation, or apportionment of special funds which falls short of a full and complete appropriation," to satisfy Article III, Section 3 of the Pennsylvania Constitution. *Id.* at 305, 877 A.2d at 401.

ments of Article III, Section 3 of the Pennsylvania Constitution, we now consider the question of whether the substance of Act 108 of 2011 satisfies the other requirement of Article III, Section 3—*i.e.*, that provisions of a proposed act pertain to a single subject.

In the recent decision in *Spahn v. Zoning Board of Adjustment of the City of Philadelphia*, 602 Pa. 83, 977 A.2d 1132 (2009), the Supreme Court considered a challenge under Article III, Section 3 to legislation that initially related to fines and penalties for violations of the Philadelphia Code. The House of Representatives later amended the proposed legislation to provide specific entities with standing in appeals in zoning and land development matters. The Supreme Court concluded that the legislation did not violate the single-subject requirement of Article III, Section 3, reasoning:

> The bill applied to the single topic of Philadelphia home rule government, seeking to amend one thing—the Home Rule Act. As stated previously, the Home Rule Act only applies to cities of the first class. Philadelphia is the only city of the first class. Furthermore, the amendments at issue in this case were narrower than Philadelphia home rule, as they related to a single Article of the Home Rule Act, i.e., that which defines *"General Grants of Powers; Limitations"* of the Home Rule Act.

*Spahn*, 602 Pa. at 110, 977 A.2d at 1148 (emphasis added). Based upon these considerations, the Supreme Court concluded:

> *[L]egislators had reasonable notice that the amendments were germane to the grants of powers and limitations on Philadelphia government.* Following the reasoning in *PAGE*, the single topic

of grants of powers and limitations on Philadelphia government certainly does not encompass the limitless subjects which could be encompassed by a broader heading, such as municipalities, since the amendments were related to a narrower single subject.

*Id.* at 111, 977 A.2d at 1148–49 (emphasis added).

In contrast to *Spahn*, the Supreme Court in *PAGE* noted that the subject "municipalities" was too broad a topic for the legislation to satisfy the single-subject requirement because a court could find a unifying theme under the general category of "municipalities" by hypothesizing a myriad of analytical connections. The Supreme Court in *PAGE*, however, had no difficulty concluding that the legislation at issue in that case generally satisfied the single-subject requirement, reasoning that the unifying theme of the legislation was the regulation of gambling.

Distilling the concepts reflected in the key decisions discussed above, we observe the following relevant factors the Supreme Court has identified in evaluating legislation under the single-subject requirement of Article III, Section 3: (1) whether there is a unifying theme that can be identified because the theme is obvious (regulation of gaming in *PAGE* ) or because a court can hypothesize a reasonable unifying theme (*Spahn* ); and (2) if a unifying theme can be identified, the provisions in the legislation must be germane to that theme. Factors that the Supreme Court has employed in approaching its analysis of challenged legislation under Article III, Section 3 include: (1) whether a proposed hypothesized theme is so broad as to stretch "the concept of a single topic beyond the breaking point" [11] or "encompasses a limitless

---

11. *PAGE*, 583 Pa. at 296–97, 877 A.2d at 396. In support of that position, the Supreme

Court wrote that "[n]o two subjects are so wide apart that they may not be brought into

number of subjects;"[12] (2) whether provisions added to a bill during the deliberative process "assist in carrying out a bill's main objective or are otherwise germane to the bill's subject as reflected in its title;"[13] (3) whether "diverse subject-matter" of the legislation "has no logical or legislative nexus" to other provisions;[14] and (4) whether the legislation pertains to a broad topic such as a local agency, and if so, whether the specific provisions have some common substantive relevance to a more narrow aspect of the broader subject.[15] We also reiterate the overarching concerns reflected in Article III, Section 3 of the Pennsylvania Constitution, the purposes of which are to ensure that (1) the members of our General Assembly and the general public have notice of provisions that may become the law of the Commonwealth, and (2) members of the General Assembly may engage in proper deliberation of proposed legislation.

With these principles in mind, we note the following with respect to Act 108:(1) the legislation amended two substantive provisions of the County Code (Sections 401 and 1805(b)) and one applicability provision; (2) amended Section 401 of the County Code pertains to the enumeration of elected county officials and is contained in Article IV of the County Code, entitled "County Officers;" (3) amended Section 1805(b) of the Code pertains to sales of personal property and surplus farm products and is contained in Article XVIII of the County Code, entitled "Contracts;" (4) the amended Section 102(a) of the County Code made the provisions of Section 401(d), which was also amended by Act 108, applicable to counties of the first, second A, and second classes; and (5) all three provisions provide county commissioners with additional powers: (a) the power to abolish the office of jury commissioner, and (b) the authority to exercise their power to sell certain county property through online and electronic auctions.

As instructed by our Supreme Court's guidance, we may engage in a reasonable hypothesis regarding a single subject of Act 108, and in doing so, we view one such subject as "the powers of county commissioners." The topic of "counties" in general is not comprised solely of matters relating to county commissioners. The subject of counties as reflected in the County Code addresses a myriad of matters of which the roles and powers of county commissioners are but a part. Thus, we do not believe that our proposed hypothetical unifying subject falls into the same categorical abyss that our Supreme Court described as impermissible in *City of Philadelphia.* This suggested unifying theme is not one that falls within the concerns the Supreme Court expressed for "limitless subjects" or the stretching of a logical connection to the breaking point. This hypothetical does not require the type of rationalization that the Supreme Court warned against when it spoke of "two subjects . . . so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough." *PAGE,* 583 Pa. at 296, 877 A.2d at 395 (quoting *Payne v. Sch. Dist. of Coudersport Borough,* 168 Pa. 386, 389, 31 A. 1072, 1074 (1895)).

---

a common focus, if the point of view be carried back far enough." *Id.* at 296, 877 A.2d at 395 (quoting *Payne v. Sch. Dist. of Coudersport Borough,* 168 Pa. 386, 389, 31 A. 1072, 1074 (1895)).

12. *PAGE,* 583 Pa. at 297, 877 A.2d at 396.

13. *Spahn,* 602 Pa. at 110, 977 A.2d at 1148.

14. *Id.*

15. *Id.*

While the provisions at issue are not organizationally located in the same articles of the County Code, they have one logical connection—they relate to the subject of county commissioners' powers. The General Assembly, in enacting the County Code, could have elected to organize that law by reference to the particular powers of county commissioners. The General Assembly could have collected in a discrete part of the County Code the numerous powers that county commissioners hold and exercise. That the General Assembly elected not to organize the County Code in this manner does not foreclose this unifying topic. Consequently, we conclude that the unifying topic of county commissioners' powers is one that we may reasonable draw, and that the two substantive provisions of Act 108 bear a logical connection to that topic. In other words, the provisions of Act 108 are germane to the unifying topic of county commissioners' powers. Based upon this analysis, we conclude that Act 108 does not violate Article III, Section 3 of the Pennsylvania Constitution.

## II. ARTICLE V, SECTION 1 AND/OR 10 OF THE PENNSYLVANIA CONSTITUTION AND THE SEPARATION OF POWERS DOCTRINE

■ The Jury Commissioners Association, pointing to the statutory provisions in the Judicial Code that provide a framework for the creation, operation, and functions of jury selection commissions, asserts that Act 108 violates Article V of the Pennsylvania Constitution and the separation of powers doctrine.[16] The Jury Commissioners Association argues that the jury selection system plays a key role in the judicial system, and that, therefore, Act 108 violates the above-noted constitutional provisions and doctrines. Essentially, the Jury Commissioners Association's primary contention is that the failure of Act 108 to create a replacement mechanism for jury selection and the failure of the General Assembly to revise the statutory framework relating to jury selection commissions to reflect the new authority of county commissioners to abolish a jury selection commission result in the noted constitutional violations. We conclude that Act 108 violates neither Article V of the Pennsylvania Constitution[17] nor the separation

16. Statutory provisions relating to jury selection commissions are found in Subchapter C of Chapter 21 of Part II of the Judicial Code, 42 Pa.C.S. §§ 2121–2124. These provisions include details regarding the number of members of a county's jury selection commission (Section 2121 of the Judicial Code); the manner of filling positions on jury selection commissions (generally by election for nonjudicial members or by appointment) (Section 2122 of the Judicial Code); expenses, staff, and quarters for jury selection commissions (Section 2123 of the Judicial Code); and the powers and duties of jury selection commissions (Section 2124 of the Judicial Code). This latter provision provides that jury selection commissions "shall exercise the powers and perform the duties vested in and imposed upon such commissions by Subchapter B of Chapter 45" of the Judicial Code, 42 Pa.C.S. §§ 4521–4527, which relates to the selection and custody of jurors. Many of these provisions more

specifically pertain to the duty of a jury selection commission to develop and maintain lists of jurors.

17. Article V, Section 1 of the Pennsylvania Constitution provides for a "unified judicial system" as follows:

The judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal and traffic courts in the City of Philadelphia, such other courts as may be provided by law and [magisterial district judges]. All courts ... and their jurisdiction shall be in this unified judicial system. Article V, Section 10 of the Pennsylvania Constitution, in general, vests in the Supreme Court the power to supervise the administration of the unified judicial system, which in-

of powers doctrine.

The Jury Commissioners Association relies upon our Supreme Court's decisions in *Wajert v. State Ethics Commission*, 491 Pa. 255, 420 A.2d 439 (1980), and *Snyder v. Unemployment Compensation Board of Review*, 509 Pa. 438, 502 A.2d 1232 (1985). Both of these decisions stand for the proposition that the Pennsylvania Constitution provides the Supreme Court with sole authority for the general supervision of the courts. The Jury Commissioners Association also mentions this Court's decision in *Olenginski v. County of Luzerne*, 24 A.3d 1103 (Pa.Cmwlth.2011), *appeal denied*, ⸺ Pa. ⸺, 42 A.3d 1061 (2012), in which we considered a challenge to legislation that made changes to a home rule ordinance resulting in the abolishment of that municipality's office of prothonotary. We concluded that the prothonotary of a common pleas court is a county officer, not a judicial officer, and that, therefore, a statute that gave county commissioners the authority to abolish that position did not violate Article V, Sections 1 or 10, or the separation of powers doctrine.

In *Olenginski*, we relied upon our Supreme Court's decision in *In re Administrative Order No. 1–MD–2003*, 594 Pa. 346, 936 A.2d 1 (2007), which involved the question of whether a prothonotary was a member of the judiciary or simply someone who performed ministerial functions derived from statute or rule of court. The Supreme Court concluded that prothonotaries have no power to act in a judicial capacity or to act as an attorney. On the basis of the Supreme Court's decision in *In re Administrative Order*, we rejected in

*Olenginski* the appellant's argument that prothonotaries are part of the judiciary: "[N]owhere in the Pennsylvania Constitution is it stated that prothonotaries are part of the judiciary and neither of those sections provides that the judiciary supervises the office of the prothonotary." *Olenginski*, 24 A.3d at 1106. In summary, we surmised that the county's prothonotary was a county official. Based upon our holding in *Olenginski*, and based upon the similar lack in the Pennsylvania Constitution of any reference to a jury system, we reject the Jury Commissioners Association's argument.

There is no support in the law for the proposition that the elected office of jury commissioner is part of the judicial system, because the courts have no *constitutional* authority to exercise control over this *statutorily*-created office. It is clear that the General Assembly has the general power to repeal the laws it has enacted,[18] unless, of course, the law amended the Pennsylvania Constitution and was ratified by the citizens of the Commonwealth.[19]

With regard to the distinct question of whether the system for jury selection that may arise following a county's decision to abolish the office of jury commissioner implicates the separation of powers doctrine, we first note that the separation of powers doctrine is a doctrine that is related to, but distinct from, the provisions of Article V of the Constitution:

> A significant purpose behind the separation of powers doctrine is to ensure that no one branch of government becomes more dominant than the others. As our Supreme Court stated in *Jefferson*,[20]

---

cludes the power to adopt rules for the practice, procedure, and conduct of all courts.

**18.** *In re Marshall*, 363 Pa. 326, 69 A.2d 619 (1949).

**19.** *Hospital & Healthsystem Ass'n of Pennsylvania v. Dep't of Ins.*, 997 A.2d 392 (Pa. Cmwlth.2010).

**20.** *Jefferson Cty. Court Appointed Emp. Ass'n v. Pa. Labor Relations Bd.*, 603 Pa. 482, 985 A.2d 697 (2009).

"[a] legislative action that impairs the independence of the judiciary in its administration of justice violates the separation of powers." *Jefferson*, 603 Pa. at 498–99, 985 A.2d at 707 ... [Further,] our courts have integrated to some extent the separation of powers doctrine and Article V of the Pennsylvania Constitution ... in analyzing such claims. [W]hile the Supreme Court referenced the overarching separation of powers doctrine, it was the fact that the *Supreme Court had already exercised its authority* under its constitutional supervisory powers that rendered the statute unconstitutional.... The general rule that we distill from these decisions is that the separation of powers doctrine provides authority for the courts of the Commonwealth to invalidate statutory provisions that intrude on the judicial prerogative to regulate the practice of law. That analysis, however, is guided by the specific authority vested in the Supreme Court through Article V of the Pennsylvania Constitution. While the separation of powers doctrine provides the general purpose behind the inquiry, the courts have evaluated such challenges by giving due consideration to the Supreme Court's supervisory powers under Article V, Section 10 of the Pennsylvania Constitution.

*Seitzinger v. Dep't of Labor and Industry*, 25 A.3d 1299, 1306–307 (Pa.Cmwlth.2011). For the reasons expressed above regarding Article V of the Pennsylvania Constitution, and in accordance with our analysis in *Seitzinger*, we conclude that Act 108 does not violate the separation of powers doctrine.

In summary, much of the Jury Commissioners Association's argument rests on an assumption that our Supreme Court, rather than the General Assembly, initiated and implemented the jury commissioner system set forth in the Judicial Code. As emphasized above, the jury commissioner system is a creature of the legislature. We are not faced here with the question of whether the General Assembly has impermissibly interfered with a system that the Supreme Court has implemented through its rule-making authority.

## III. DUE PROCESS AND VAGUENESS STANDARDS

■ The sole basis of the Jury Commissioners Association's argument that Act 108 is void due to vagueness is that the General Assembly failed to include a replacement mechanism for the implementation of a different jury selection system. The Jury Commissioners Association contends that this failure constitutes a violation of "the essential right of due process under ... the Fourteenth Amendment ... due to its extreme vagueness." (Jury Commissioners' Brief at 39.) In support of that position, the Jury Commissioners Association refers us to United States Supreme Court decisions involving the First Amendment and criminal statutes.

In the context of challenges to criminal statutes, the United States Supreme Court has opined that criminal statutes should set forth the description of criminal conduct with sufficient "definiteness" so that ordinary people can understand the conduct that is prohibited and so that those who are meant to enforce the law may do so in a non-arbitrary or discriminatory manner. *Gonzales v. Carhart*, 550 U.S. 124, 149, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). In the context of cases in which the United States Supreme Court has considered challenges to statutory measures allegedly implicating First

Amendment rights, the United States Supreme Court has held:

> The void for vagueness doctrine reflects the principle that "a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Construction Co.*, 269 U.S. 385 391 [46 S.Ct. 126, 70 L.Ed. 322] (1926). The requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values, reduces the danger of caprice and discrimination in the administration of the laws, enables individuals to conform their conduct to the requirements of law, and permits meaningful judicial review.

*Roberts v. United States Jaycees*, 468 U.S. 609, 629, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (holding state law that compelled Jaycees to accept women as members did not violate Jaycees freedom-of-association rights) (alternate language in original; certain internal citations omitted).

 Although the freedom-of-association and other First Amendment cases that the United States Supreme Court has issued make clear that, contrary to the County Commissioners' argument, the void-for-vagueness doctrine applies to fundamental constitutional rights other than liberty, we do not agree with the Jury Commissioners Association's argument that Act 108 implicates the void-for-vagueness doctrine. The void-for-vagueness doctrine, in general, represents a principle implicated in challenges to laws affecting conduct. As suggested above, the United States Supreme Court has invoked the doctrine when a legislature enacts a law that may dampen or impede an individual's right to engage in certain conduct. The doctrine generally prohibits the enforcement of laws that are unclear as to meaning or enforcement and thus fail to provide sufficient clarity as to what behavior may warrant application of the subject law. In the realm of First Amendment law, the doctrine applies where a law deters an individual's right to speak or to associate.

By comparison, the legislation at issue in this matter does not invoke *similar* constitutional concerns. Although we do not disagree with the Jury Commissioners Association's suggestion that the selection of a jury may implicate due process concerns, Act 108 does not itself touch upon the conduct of persons to whom it applies. Act 108 applies to county commissioners, enabling them to abolish an office that relates to the selection of juries. Act 108 neither defines conduct that may result in the imposition of a criminal sanction nor does it define or constrict any aspect of free speech. Although an improperly composed jury may give rise to a claim that trial procedure violated an individual's due process rights, the Jury Commissioners Association has directed this Court to no decisions in which the mere possibility of consequential due process interests, rather than direct due process interests, compel the application of the void-for-vagueness doctrine.

Moreover, the Jury Commissioners Association fails to acknowledge that Act 108 does include conditions precedent to the abolishment of the office of jury commissioner. Act 108 requires county commissioners to ensure that a jury-pool list exists and the list must be comprised of a cross-representation of the community before county commissioners may adopt a resolution abolishing the office of jury commissioner. Thus, we conclude that there is a reasonable manner to reconcile

the General Assembly's decision to retain the provisions of the Judicial Code that are pertinent to the office of Jury Commissioner and Act 108—those counties that continue to retain the office are bound by the provisions of the Judicial Code in the use of the Jury Commissioner system, but those that desire to abolish the office must satisfy the condition set forth in Act 108 to ensure that the county has an established list of potential jurors.

Finally, we note that the Jury Commissioners Association, in arguing that Act 108 is *void for vagueness,* misguidedly refers the Court to the Supreme Court's decision in *PAGE* for the proposition that, when the General Assembly confers authority upon a governmental entity to do something, the legislation must affirmatively reflect the policy choices the legislature made and "contain adequate standards that will guide and restrain the exercise of the delegated administrative functions." (Jury Commissioners Association's Brief at 40.)

First, the Jury Commissioners Association appears to ignore the fact that county commissioners have the power to enact ordinances that could fill any vacuum created by the abolishment of the office of jury commissioner. Section 509(a) of the County Code, 16 P.S. § 509(a), provides that "[t]he board of commissioners may adopt resolutions and ordinances prescribing the manner in which powers of the county shall be carried out and generally regulating the affairs of the county." As noted above, the amendment to Section 401 of the County Code, 16 P.S. § 401, provides as follows with regard to jury lists: "After review of the procedures in effect within the county *to ensure that lists of potential jurors are a representative cross section of the community,*" the board of commissioners may pass a resolution to abolish the office of Jury Commissioner.

(Emphasis added.) Thus, the amendment recognizes the underlying original purpose for the General Assembly to create the office of jury commissioner—avoiding executive interference with the jury system—and prohibits the abolishment of the office unless county commissioners have determined that the county's jury selection lists will provide for a satisfactory representation of the public.

■ Second, the question the Court addressed in *PAGE* was whether the General Assembly had unconstitutionally delegated *legislative* power. *See Blackwell v. State Ethics Commission,* 523 Pa. 347, 567 A.2d 630 (1989) (holding that General Assembly improperly delegated act of legislating to subordinate commission of legislature). Here, the General Assembly did not delegate a legislative function. It granted an additional power to county commissioners that relates solely to a matter of local concern. Act 108 does not confer a function of the General Assembly to another governmental entity, and thus, Act 108 does not violate the constitutional doctrine prohibiting improper delegation of a legislative function.

Accordingly, we conclude that Act 108 does not violate any of the constitutional provisions upon which the Jury Commissioners Association rely in seeking to obtain declaratory and injunctive relief. Because there are no disputes regarding the facts, and because we believe that Intervenor is entitled to relief as a matter of law, we will grant Intervenor's motion for judgment on the pleadings, and we will deny the Jury Commissioners Association's motion for judgment on the pleadings.

### ORDER

AND NOW, this 26th day of July, 2012, Petitioners' motion for judgment on the pleadings is hereby DENIED and the motion for judgment on the pleadings filed by

Intervenor County Commissioners Association of Pennsylvania is hereby GRANTED.

DISSENTING OPINION BY President Judge PELLEGRINI.

Because I can't see how the abolishment of jury commissioners and the sales of personal property and surplus farm products are in any way germane to each other, I would find that Act 108 of 2011 is unconstitutional under Article III, Section 3 of the Pennsylvania Constitution because it contains more than one subject.

I.

Article III, Section 3 of the Pennsylvania Constitution, relating to the form of bills, provides that "[n]o bill shall be passed containing more than one subject, which shall be clearly expressed in its title...." Article III's aim was to "place restraints on the legislative process and encourage an open, deliberative, and accountable government." *City of Philadelphia v. Commonwealth*, 575 Pa. 542, 586, 838 A.2d 566, 585 (2003) (*quoting Pennsylvania AFL–CIO ex rel. George v. Commonwealth*, 563 Pa. 108, 119, 757 A.2d 917, 923 (2000)).

In carrying out that goal, this provision contains two restrictions on legislative power. One restriction is that the subject "shall be clearly expressed in the title." Under this restriction, the title need not give an index of its contents but shall give a reasonably clear notice of the matter to be found in it, and this need not include subjects accidentally but not directly affected by it. The majority of the objections to acts based on supposedly defective titles have been that the title did not point out with sufficient particularity the exact contents of the act, and most of these objections failed of their purpose because of the interposition of the principle that

such particularity of enumeration is unnecessary so long as the title gives reasonable notice and is not misleading. *Id.* at 579, 838 A.2d at 589. There is no claim here that the title is misleading or that it does not describe the subject of the legislation.

The other restriction is that the bill shall contain only one subject. Requiring a single subject serves many purposes. One purpose is to guard against "logrolling" by which several distinct matters are placed on one bill so that it is passed by combining the minorities who favored the individual matters to secure the bill's enactment. *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 583 Pa. 275, 293, 877 A.2d 383, 394 n. 7 (2005). In other words, each subject of legislation does not fall or stand on its own merits but on the result of vote swapping. A second purpose is to prevent riders from being attached "to bills that are [so] popular ... that the rider will secure adoption not on its own merits, but on the merits of the measure to which it is attached." *Id.* at 294, 877 A.2d at 395. For example, another subject—a rider authorizing environmental degradation—could be attached in committee to a bill to reduce taxes. Members who want taxes reduced would have to accept the passage of the environmental degradation provisions even though they were against its passage. It would even allow those members who favored the bill to hide that fact by saying that he or she was "forced" to vote for environmental degradation to reduce taxes. A third purpose is that by putting more than one subject in a bill forces a governor to choose between enacting some provisions he or she dislikes and vetoing the entire bill, including subjects he or she favors. Similarly, attaching a rider to an otherwise popular bill can effectively make a bill "veto-proof." For example, it would be very difficult for a governor to veto a bill

that reduced taxes even if it contained other subjects that he or she opposed.[1]

In order to determine when a bill contains more than a single subject, we look to see whether the provisions of the bill or provisions added during the legislative process assist in carrying out a bill's main objective or are otherwise *"germane"* to the bill's subject as reflected in its title. *City of Philadelphia*, 575 Pa. at 574–576, 838 A.2d at 586–587. If a bill has two or more dissimilar topics and there can be no legitimate connection with each other, the bill violates the single subject rule. In making the determination whether the objects of a bill are germane or dissimilar to its subject, we have been cautioned to apply a common sense view as to whether the provisions carry out the bill's main objective and our evaluation should be balanced.

> As stated by our [Supreme Court] in *Payne v. School Dist. of Coudersport Borough,* 168 Pa. 386, 31 A. 1072, 1074 (1895), "no two subjects are so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough." Thus, defining the constitutionally-valid topic too broadly would render the safeguards of Section 3 inert. Conversely, the requirements of Section 3 must not become a license for the judiciary to "exercise a pedantic tyranny" over the efforts of the Legislature. *City of Philadelphia*, 838 A.2d at 588 (citing *Estate of Rochez*, 511 Pa. 620, 515 A.2d 899, 902 (1986)).

*Pennsylvanians Against Gambling Expansion Fund,* 583 Pa. at 296, 877 A.2d at 395–396.

However, while we should not exercise "pedantic tyranny" over the legislature in making that evaluation, that does not mean that a bill should not be struck down because it may inconvenience the legislature because one of the purposes behind the single subject rule was to make it inconvenient for the legislature to pass omnibus bills. We are also not to take into consideration the "practicalities" such as the bill would have passed anyway because that is not a factor in determining whether the bill violates the single subject rule and, more important, the judiciary should not make those determinations of whether a bill would pass or not. After all, our main goal in finding whether a bill violates the single subject rule is to carry out the Constitution, not to be obsequious to the legislature.

### II.

The full text of the title of Act 108 of 2011 is as follows:

> Amending the act of August 9, 1955 (P.L. 323, No. 130), entitled, as amended, "An act relating to counties of the first, third, fourth, fifth, sixth, seventh and eighth classes; amending, revising, consolidating and changing the laws relating thereto; relating to imposition of excise taxes by counties, including authorizing imposition of an excise tax on the rental of motor vehicles by counties of the first class; and providing for regional renaissance initiatives," in contracts, further providing *for applicability, for the abolishment of the office of jury commissioner and for sales of personal property and surplus farm products.* (Emphasis added.)

---

1. Article IV, § 15 of the Pennsylvania Constitution provides, in relevant part:
 Every bill which shall have passed both Houses shall be presented to the Governor; if he approves he shall sign it, but if he shall

 not approve he shall return it with his objections to the House in which it shall have originated, which House shall enter the objections at large upon their journal, and proceed to reconsider it.

The provisions in the bill do exactly what the title provides notice of—Act 108 allows for the sales of personal property and surplus farms products and eliminates an elected office of jury commissioner. The majority finds that the Act does not contain more than one subject because:

> While the provisions at issue are not organizationally located in the same articles of the County Code, they have one logical connection—they relate to the subject of county commissioners' powers. The General Assembly, in enacting the County Code, could have elected to organize that law by reference to the particular powers of county commissioners. The General Assembly could have collected in a discrete part of the County Code the numerous powers that county commissioners hold and exercise. That the General Assembly elected not to organize the County Code in this manner does not foreclose this unifying topic. Consequently, we conclude that the unifying topic of county commissioners' powers is one that we may reasonably draw, and that the two substantive provisions of Act 108 bear a logical connection to that topic. In other words, the provisions of Act 108 are germane to the unifying topic of county commissioners' powers. Based upon this analysis, we conclude that Act 108 does not violate Article III, Section 3 of the Pennsylvania Constitution.

*Pennsylvania State Association of Jury Commissioners, et al. v. Commonwealth of Pennsylvania, et al.,* 53 A.3d 109 (Pa. Cmwlth.2012).

Simply, the unifying purpose is that it deals with the powers of the County Commissioners. I dissent for several reasons.

First, the selling surplus is not at all germane to the elimination of an elected public office changing the form of county government, and selling surplus property is so far apart that there is no common focus. The objects of these provisions do not enhance each other but contain different subjects. Even the majority acknowledges that they are not in the same article of the County Code, which indicates that those provisions are not related to each other.

Second, just because both objects involve the powers of the County Commissioners, that does not make elimination of the jury commissioners and selling surplus property germane to each other. All bills enacted involve someone's power. A bill could allow the governor to regulate Marcellus Gas and allow him or her to consolidate school districts. Under the majority, the subjects would be germane because they involve the powers of the governor. However, no one would consider those topics germane—not the governor, not legislators, not lobbyists and, most important, not citizens. Similarly, there are separate constituencies for elimination of jury commissioners and sale of surplus farm property which indicates that Act 108 has two subjects.

Third, evidencing that the subjects are not at all connected is that Act 108 deals with two different types of powers that the County Commissioners, as a unitary governing body, are entrusted. The sale of personal and surplus farm property is an executive power while the elimination of county commissioners as a "may" authorization is "enacted" under its legislative powers.

Finally, I dissent because the majority interprets germaneness so broadly that it renders the restrictions of Article III, Section 3 meaningless. It sanctions "logrolling" because a minority of legislators may want the county to be able to sell surplus farm property and a minority may want to eliminate jury commissioners and to get both, they may swap their votes to get it

passed. It sanctions the addition of riders because the elimination of jury commissioners may be so widely popular by including the sale of surplus property which may not be or vice-versa. It adversely impacts the governor's veto power because he or she may consider the sale of surplus property so important that he or she may let the elimination of jury commissioners, which he or she would otherwise oppose, become law rather than veto an entire bill.

Accordingly, because the majority holding does "encourage an open, deliberative, and accountable government," I respectfully dissent.

Judges McGINLEY and LEADBETTER join in this dissenting opinion.